## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Brett Steele, | ) | |
|     Plaintiff, | ) | |
| | ) | |
|      v. | ) | Civil No. 13-cv-01229 (APM) |
| | ) | |
| Ashton Carter,[1] | ) | |
| Secretary of Defense, | ) | |
| | ) | |
|     Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

## I.  INTRODUCTION

In August 2010, Plaintiff Dr. Brett Steele, then 47 years old, was hired on a probationary basis as an Associate Professor at the National Defense University's College of International Security Affairs ("CISA").  Plaintiff's first year was not all smooth sailing.  Twice, Plaintiff met with his supervisors, who expressed displeasure—sometimes vigorously—with aspects of Plaintiff's teaching strategies and curriculum decisions.  Despite these issues, however, Plaintiff felt that his time at CISA had been successful.  As a consequence, he was surprised when, in May 2011, he was notified that he would be terminated from his position at the end of the summer semester.  Two months later, after CISA refused to provide Plaintiff with a reason for his dismissal, Plaintiff filed an informal complaint with the Equal Employment Opportunity ("EEO") Commission.

In August 2011, after receiving complaints from two employees regarding Plaintiff's behavior, CISA placed Plaintiff on administrative leave with pay, rescinded his security status, and barred him from entering Fort McNair and Fort Bragg, where CISA classes are taught.  Several

---

[1] Ashton Carter, Secretary of Defense, substituted as Defendant for Chuck Hagel, former Secretary of Defense.

days later, on August 19, 2011, Plaintiff resigned. Plaintiff then filed a formal EEO complaint, alleging that he had been subject to disparate treatment based on age and prior EEO activity, as well as a hostile work environment. Plaintiff's EEO complaint was denied on May 10, 2013. He then filed suit in this court, alleging age discrimination, retaliation, and hostile work environment under the Age Discrimination in Employment Act ("ADEA"), as well as constructive discharge and a claim for equitable relief.

Before the court is Defendant Ashton Carter's Motion to Dismiss and/or for Summary Judgment. After reviewing the pleadings and the accompanying exhibits, the court will enter summary judgment in favor of Defendant on all of Plaintiff's claims.

## II. BACKGROUND

### A. Factual Background

Before turning to the facts, the court explains how it evaluated the record evidence. As required by Local Rule of Civil Procedure 7(h), Defendant appropriately submitted a statement of facts as to which it contends there is no material dispute. *See* Def.'s Mot. for Summ. J., ECF No. 25, Def.'s Mem. in Support of its Mot. for Summ. J., ECF No. 25-1 [hereinafter Def.'s Mem.], Statement of Material Facts Not in Dispute, ECF No. 25-2 [hereinafter DSMF]. Plaintiff, however, did not respond pursuant to the requirements of the rule. Instead, he filed both (1) a Statement of Material Facts in Dispute, Pl.'s Opp'n to Def.'s Mot. for Summ. J., ECF No. 28 [hereinafter Pl.'s Opp'n], Statement of Material Facts in Dispute, ECF No. 28-1 [hereinafter Pl.'s Disputed Facts], and (2) a Response to Defendant's Statement of Material Facts Not in Dispute, Pl.'s Opp'n, Resp. to Def.'s Statement of Material Facts Not in Dispute, ECF No. 28-2 [hereinafter PSMF].

In the latter document, Plaintiff frequently states that a fact proffered by Defendant is "disputed" "to the extent that the Agency is offering th[e] statement" as evidence that Plaintiff

"was not terminated because of his age" or "was not placed on administrative leave because of engagement in protected EEO activity." *See, e.g.*, PSMF ¶¶ 21, 22, 24, 28-30, 32-33. As support for those contentions Plaintiff does not cite record facts, but instead, cross-references paragraphs in his own Statement of Material Facts in Dispute. Often, however, the cross-referenced paragraphs themselves do not contain assertions of fact based on the record evidence. Instead, they contain legal conclusions cast as factual allegations. For instance, Plaintiff offers as a disputed material "fact" that he was "terminated because of his age" or that adverse actions were taken against him "because of his engagement in protected EEO activity." *See, e.g.*, Pl.'s Disputed Facts ¶¶ 2, 11-13. Such statements, of course, are not assertions of fact, but rather are legal conclusions.

As a consequence of Plaintiff's practice, it has been difficult to separate the facts that are not in genuine dispute from those that are. The court nevertheless has done its best to make that determination. In reciting the facts below, the court cites to Plaintiff's Response to Defendant's Statement of Facts and Defendant's Statement of Material Facts Not in Dispute when the parties expressly agree that facts are not in dispute. It generally cites to Defendant's Statement of Material Facts Not in Dispute when Plaintiff has provided no evidence to rebut the undisputed fact stated by Plaintiff. *See* LCvR 7(h) ("In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."). Otherwise, the court cites directly to the record.

### 1. CISA's Decision to Hire Plaintiff

In the spring of 2010, Plaintiff Dr. Brett Steele (DOB 1963), then age 47, applied to become a professor at the National Defense University's College of International Security Affairs

("CISA"). DSMF ¶¶ 1, 8; PSMF ¶¶ 1, 8; Am. Compl., ECF No. 16, ¶ 1. CISA serves to provide "interagency and international security education [which] promot[es] a common understanding among agencies, nations, and military services." DSMF ¶ 2; PSMF ¶ 2. It has two campuses— one at Fort McNair in Washington, D.C., and one at Fort Bragg in North Carolina—and includes a variety of programs funded by a hodgepodge of sources. DSMF ¶¶ 2-3.

As part of the CISA hiring process, Plaintiff was interviewed twice by multiple professors, including Dr. Alejandra Bolanos and Dr. Querine Hanlon, who were to (and did) serve as first and second level supervisors, respectively, for the new hire. DSMF ¶ 4; PSMF ¶ 4. Plaintiff initially was offered a position at Fort Bragg, which he declined. DSMF ¶ 5; PSMF ¶ 5. He then was offered an Associate Professor position at Fort McNair, which he accepted. DSMF ¶ 5; PSMF ¶ 5. The position was a renewable three-year professorship that was probationary for the first year. DSMF ¶ 8; PSMF ¶ 8. Plaintiff began teaching in August 2010. Am. Compl. ¶ 14.

### 2. Conflict Involving Plaintiff's Teaching Methods

Over the course of the 2010-2011 academic year, Plaintiff taught or co-taught several classes: Geostrategy; Origins of Conflict in War; Strategic Thought; and Cyber Strategy. DSMF ¶ 9; PSMF ¶ 9. Early in the spring 2011 semester, conflict began to arise between Plaintiff and his supervisors regarding his teaching methods and curriculum decisions. On February 17, 2011, Plaintiff attended a meeting with his supervisors, Dean Hanlon and Dr. Bolanos, who admonished Plaintiff about his use of an unapproved concept in his Strategic Thought sections, as well as his decision to stray from the syllabus he was required to follow. DSMF ¶ 11; PSMF ¶ 11; Pl.'s Opp'n, Ex. 1, Dep. of Brett Steele, ECF No. 28-4 [hereinafter Pl.'s Steele Dep.], at 52-56. As a result of this conversation, Plaintiff "modified his teaching instruction to conform to Dean Hanlon's request." DSMF ¶ 11; PSMF ¶ 11.

Sometime after Plaintiff's meeting with Dean Hanlon, Dr. Bolanos—Plaintiff's first-level supervisor—informed Plaintiff that she had heard that students had complained to Colonel Bell, the Chancellor of CISA, about Plaintiff's instruction. DSMF ¶ 12; PSMF ¶ 12. Shortly thereafter, on March 18, 2011, Plaintiff met with Colonel Bell, Dean Hanlon, and Dr. Bolanos to discuss alleged student and faculty concerns about his teaching methods and his decision to present information to the class that was neither on the syllabus nor the final exam. DSMF ¶ 13; PSMF ¶ 13. Among other issues, the administrators stated that students were concerned that Plaintiff's decision to veer off the syllabus in Strategic Thought would put the students in his section at a disadvantage, because the students were graded by professors from other sections who did not teach that material. DSMF ¶ 13; PSMF ¶ 13. All parties agree that this "academic debate" between Colonel Bell and Plaintiff became heated, with Plaintiff alleging that Colonel Bell "scream[ed] and yell[ed] at [him]," Am. Compl. ¶ 27, and Colonel Bell admitting "I had raised my voice in that meeting to get [Plaintiff's] attention," Pl.'s Opp'n, Ex. 2, Dep. of Michael Bell, ECF No. 28-5 [hereinafter Pl.'s Bell Dep.], at 11.[2]

### 3. Termination of Plaintiff's Employment at CISA

In 2010, the Department of Defense experienced a reduction in its budget. Anticipating that the National Defense University ("NDU") would face a 10 to 15 percent budget cut, the administration determined that CISA, as part of NDU, would need to eliminate three faculty positions.[3] PSMF ¶ 15; Pl.'s Bell. Dep. at 34-36, 44-45; Def.'s Mot. for Summ. J., ECF No. 25, Def.'s Mem. in Support, ECF No. 25-1 [hereinafter Def.'s Mem.], Ex. 2, Dep. of Michael Bell,

---

[2] Neither party submitted the entirety of either Plaintiff or Colonel Bell's depositions. Thus the court cites to excerpts provided by both parties using ECF page numbers.
[3] Plaintiff states that this critical fact is "disputed." PSMF ¶ 15. As described above, however, Plaintiff cross-references various paragraphs in her own Statement of Material Facts in Dispute in order to provide evidence of such a dispute. *Id.* None of these paragraphs, however, sets forth any fact that would contradict or undermine Defendant's assertions that budget reductions at NDU preceded Plaintiff's termination. Therefore, the court considers it undisputed that NDU was subject to budget constraints that gave rise to the decision to terminate faculty members.

ECF No. 25-4 [hereinafter Def.'s Bell Dep.], at 10-14; Pl.'s Opp'n, Ex. 6, Aug. 31, 2012, Fact-Finding Conference [hereinafter Pl.'s Ex. 6], at 117-19. Ultimately, CISA administrators determined that only employees who were on probationary status would be considered and selected for termination. Pl.'s Bell Dep. at 41-42 (testifying that "[CISA] did not look at terminating anyone who was past their probationary year").

NDU sought a waiver to avoid making staff reductions, but learned in May 2011 that the waiver request had been denied. DSMF ¶ 17; PSMF ¶ 17; Def.'s Bell Dep. at 91-92; Pl.'s Bell Dep. at 34. At the time, only six CISA employees definitively held probationary status: Plaintiff, Dr. Art Westneat, Dr. David Ucko, Dr. Jay Parker, Dr. Paul Miller, and Seth Malaguerra. Def.'s Mem., Decl. of Michael Bell, ECF No. 25-6 [hereinafter Bell Decl.], at 4.[4] Colonel Bell and Dean Hanlon made the decision to recommend to Admiral Ann Rondeau, the President of NDU, that Plaintiff, Westneat, and Malaguerra be terminated. DSMF ¶¶ 17; PSMF ¶¶ 17. Admiral Rondeau approved their recommendation. DSMF ¶¶ 17; PSMF ¶¶ 17.

On May 18, 2011, Dean Hanlon met with Plaintiff to inform him that he would be terminated from employment at CISA when the summer semester ended on August 17, 2011. DSMF ¶ 22; PSMF ¶ 22. Dr. Bolanos and Dean Herman Meyer, CISA's Dean of Students, also were present at the meeting. DSMF ¶ 22; PSMF ¶ 22. Dean Hanlon did not provide a reason for the termination. DSMF ¶ 22; PSMF ¶ 22. Two months later, on July 20, 2011, Plaintiff filed an informal EEO complaint alleging that he had been removed due to his age. DSMF ¶ 23; PSMF ¶ 23.

---

[4] Plaintiff states that John Harrison is another probationary employee, Pl.'s Steele Dep. at 39, but does not provide evidence in support of this assertion. None of the CISA administrators confirmed this claim and Defendant did not mention him as a probationary member. Accordingly, he is not listed here. His possible impact on the case, however, is discussed below.

In the last few weeks of the summer semester, two CISA employees lodged complaints against Plaintiff, stating that they "felt threatened by [Plaintiff] who was acting erratically and aggressively." DSMF ¶ 24; PSMF ¶ 24.[5] On August 2, 2011, Plaintiff was called into Colonel Bell's office for a meeting, DSMF ¶ 25; PSMF ¶ 25, at which Colonel Bell intended to inform Plaintiff that he was being placed on administrative leave, Pl.'s Bell Dep. at 15-16. Once again, the meeting became heated. At some point during the encounter, Colonel Bell hit his fist on the desk, causing Plaintiff to get up to leave the room. DSMF ¶¶ 26-27; PSMF ¶¶ 26-27; Pl.'s Opp'n, Ex. 9, Aug. 31, 2012, Fact-Finding Conference, ECF 28-12 [hereinafter Pl.'s Ex. 9], at 30-31. On his way out, Plaintiff was blocked—it is unclear whether accidentally or intentionally—by two CISA administrators, Dean Herman Meyer and Dean Craig Deare, both of whom had been present at the meeting. DSMF ¶ 27; PSMF ¶ 27; Pl.'s Ex. 9 at 31. Once outside the office, Plaintiff was met by security officials and Military Police Officers, who collected his ID and keys and escorted him to his office to collect his belongings. DSMF ¶ 27; PSMF ¶ 27. Later that day, Plaintiff was placed on administrative leave with pay and was banned from Fort McNair and Fort Bragg. DSMF ¶ 29; PSMF ¶ 29. Plaintiff resigned 15 days later on August 17, 2011. *See* Pl.'s Opp'n, Ex. 18, ECF No. 28-21.

---

[5] Plaintiff "disputes" this critical fact "to the extent that the Agency is offering this statement as evidence that Dr. Steele was not placed on administrative leave because of engagement in protected EEO activity." PSMF ¶ 24. To support that contention, Plaintiff cites to paragraphs 6-8, 10-13, and 66 of his Statement of Material Facts in Dispute. Pl.'s Disputed Facts. None of those paragraphs, however, cite to any non-conclusory record evidence to show either that no employee complaints were filed or that Colonel Bell did have reason to believe such complaints had been filed. Plaintiff's conclusory assertions—such as he was placed on Do Not Admit Status and escorted form the campus "because of his engagement in protected EEO activity," *id.* ¶¶ 11-12—cannot create a genuine dispute of material fact. *See Hendricks v. Geithner*, 568 F.3d 1008, 1012 (D.C. Cir. 2009) (stating that, after the movant has demonstrated the absence of a genuine issue of material fact, "the burden shifts to the opposing party to come forward with *specific facts* showing that there is a genuine issue for trial") (internal quotation marks and citation omitted) (emphasis added). Further, record evidence supports Defendant's claim that that these complaints in fact were made. Pl.'s Ex. 6 at 126; Def.'s Mem, Investigative File, ECF No. 25-5, at 2.

During the next semester, three faculty members—Dr. Sean McFate (DOB 1969), Dr. Jay Parker (DOB 1952), and Dr. Peter Thompson (DOB 1973)—took over Plaintiff's teaching duties. DSMF ¶ 28; PSMF ¶ 28.

## B. Procedural Background

Two and a half months after his resignation, on or about November 2, 2011, Plaintiff filed a formal complaint with the Department of Defense's EEO office. Am. Compl. ¶ 10. On May 10, 2013, the EEO office issued a Final Agency Decision rejecting Plaintiff's claims and giving Plaintiff the right to file a complaint in federal court. Am. Compl. ¶ 11. On August 9, 2013, Plaintiff timely filed his Complaint, alleging age discrimination, retaliation, and hostile work environment under the Age Discrimination in Employment Act ("ADEA"), as well as constructive discharge and a claim for equitable relief. Am. Compl.; *see also* Compl., ECF No. 1.

Following discovery, on May 4, 2015, Defendant filed a Motion to Dismiss[6] and/or for Summary Judgment. Def.'s Mot. to Dismiss and/or for Summ. J., ECF No. 25. Defendant's Motion is now ripe for consideration.[7]

## III. LEGAL STANDARDS

### A. Motion for Summary Judgment

Summary judgment will only be granted if the movant can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, the court reviews all "[u]nderlying facts and

---

[6] Defendant moved to dismiss, under Federal Rule of Civil Procedure 12(b)(1), Plaintiff's claims to the extent that they seek "compensatory damages" because such damages are barred by sovereign immunity. Def.'s Mem. at 17-19. Plaintiff, however, concedes in his Opposition that he "is not seeking compensatory damages." Pl.'s Opp'n at 23. Accordingly, Defendant's Motion to Dismiss is denied as moot.

[7] In its Motion, Defendant argues that Count IV (Constructive Discharge) is redundant to Counts I and/or II, and Count V (Equitable Relief) is a recitation of relief requested by Plaintiff, and therefore, both Counts IV and V should be dismissed. Plaintiff does not respond to these arguments in its Opposition and thus concedes the arguments. Accordingly, Counts IV and V are dismissed.

inferences . . . in the light most favorable to the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the nonmoving party, while a fact is "material" only if it is capable of affecting the outcome of litigation. *Id.* at 248. A non-material factual dispute is insufficient to prevent the court from granting summary judgment. *Id.*

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, [ ] on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion" and identifying those portions of the record that it believes "demonstrate the absence of a genuine issue of material fact." *Id.* at 323.

Once the moving party has made an adequate showing that a fact cannot be disputed, the burden shifts to the party opposing summary judgment to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (citation and internal quotation marks omitted) (footnote omitted). The nonmoving party may oppose the motion using "any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which [the Court has] referred." *Celotex Corp.*, 477 U.S. at 324. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255 (citations omitted). However, "to defeat a motion for summary judgment, the non-moving party must offer more than mere unsupported allegations or denials." *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 17 (D.D.C. 2011) (citing *Celotex*, 477 U.S. at 324). In other words, if the non-

movant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50. Summary judgment, then, is appropriate when the non-moving party fails to offer "evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252.

## IV.    DISCUSSION

### A.    Plaintiff's Discrimination Claim

Under the Age Discrimination in Employment Act (ADEA), the federal government is prohibited from discriminating against its employees due to their age. Specifically, Section 633a(a) of the ADEA states that "[a]ll personnel actions affecting employees or applicants for employment [in the federal government] who are at least 40 years of age . . . shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a). To pursue a discrimination claim under the ADEA, a plaintiff may use either direct or circumstantial evidence. *Mianegaz v. Hyatt Corp.*, 319 F. Supp. 2d 13, 18 (D.D.C. 2004) (citing *Dunaway v. Int'l Bd. Of Teamsters*, 310 F.3d 758, 763 (D.C. Cir. 2002)); *Holbrook v. Reno*, 196 F.3d 255, 260 (D.C. Cir. 1999). Where a plaintiff offers "only indirect evidence" of discrimination, however, the court must follow the three-part, burden-shifting framework originally established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for use in Title VII cases. *See Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1077 (D.C. Cir. 1999) (applying the *McDonnell Douglas* framework to ADEA claims); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 140-43 (2000) (assuming the *McDonnell Douglas* framework applied to ADEA claims). Because the framework for determining ADEA and Title VII claims overlaps significantly, the court cites throughout this opinion—as applicable—case law from both ADEA and Title VII cases.

The *McDonnell Douglas* framework involves three steps. First, the plaintiff must establish, by a preponderance of the evidence, a *prima facie* case of discrimination. *Stella v. Mineta*, 284 F.3d 135, 144 (D.C. Cir. 2002) (citations omitted). This burden, however, "is not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Here, to establish a *prima facie* case under the ADEA, Plaintiff must show that he: (1) is a member of the protected class (*i.e.*, is over 40 years old); (2) was qualified for the position at CISA; (3) suffered an adverse employment action; and (4) was disadvantaged in favor of a substantially younger person. *Martin v. District of Columbia*, 78 F. Supp. 3d 279, 294-95 (D.D.C. 2015) (citing *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1155 (D.C. Cir. 2004) (observing that the plaintiff failed to make out a *prima facie* case when she neglected to show that she was disadvantaged in favor of a "substantially younger" person)); *see also O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) (noting that in discrimination cases, "[t]he fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out *because of his age*"). Second, if the plaintiff establishes a *prima facie* case, the employer then must articulate a legitimate, non-discriminatory reason for its actions. *Stella,* 284 F.3d at 144. If the employer proffers such a reason, the burden shifts back to the plaintiff to prove that the legitimate reason provided by the employer was in fact pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802-05.

At the summary judgment stage, however, once an employer sets forth a legitimate, non-discriminatory reason for taking the employment action, "the question whether the employee actually made out a prima facie case is no longer relevant and thus disappears and drops out of the picture." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493-94 (D.C. Cir. 2008) (citations and internal quotation marks omitted); *see also Nurriddin v. Bolden*, 818 F.3d 751, 758 (D.C. Cir.

2016) ("At the summary judgment stage, once the employer has claimed a nondiscriminatory reason for its actions, [the *McDonnell Douglas*] burden-shifting framework disappears."); *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (applying the *Brady* framework to the ADEA).

At that point, the court must determine whether "the employee [has] produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of" some prohibited ground. *Brady*, 520 F.3d at 494 (citations omitted); *Nurriddin*, 818 F.3d at 758 ("The 'one central inquiry' that remains is whether a reasonable jury could infer retaliation or discrimination from all the evidence.") (citation omitted)). Courts consider this issue "in light of the total circumstances of the case," asking

> whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer.

*Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998)) (internal quotation marks omitted); *see also Nurriddin*, 818 F.3d at 758.

Although a plaintiff suing a *private employer* only may succeed on an ADEA claim by "prov[ing] by a preponderance of the evidence . . . that age was the 'but-for' cause of the challenged employment action," *Spaeth v. Georgetown Univ.*, 943 F. Supp. 2d 198, 205 (D.D.C. 2013) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009)) (internal quotation marks omitted), this is not the same for plaintiffs who sue federal employers. A plaintiff suing the federal government need only show that "age was *a* factor in the employer's decision" in order to earn

declaratory and possibly injunctive relief. *Ford v. Mabus*, 629 F.3d 198, 206 (D.C. Cir. 2010). A government employee who desires to receive reinstatement or backpay, however, must meet the higher burden of proving that age was the 'but-for' cause of the employment action. *Id.* at 207.

### 1. Direct Evidence of Discrimination

Before the court turns to the circumstantial evidence of discrimination offered by Plaintiff, it first must address whether Plaintiff has offered the type of "direct evidence" that "would generally entitle a plaintiff to a jury trial." *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1246-47 (D.C. Cir. 2011) (analyzing a case under the D.C. Human Rights Act, which is analyzed "in the same way that [the court] analyze[s] discrimination claims under the federal anti-discrimination laws"); *Hampton v. Vilsack*, 760 F. Supp. 2d 38, 49-50 (D.D.C. 2011), *aff'd*, 685 F.3d 1096 (D.C. Cir. 2012) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)). One example of direct evidence is "a statement that itself shows racial or gender bias in the [employment] decision." *Vatel*, 627 F.3d at 1247.

Plaintiff asserts that he has provided direct evidence of discrimination. Pl.'s Opp'n at 12. He points to his own deposition testimony, during which he recounted that his first level supervisor, Dr. Bolanos, made "[s]tatements . . . that were highly praising younger people and [showing] dislike for certain older employees." Pl.'s Steele Dep. at 35-36. Plaintiff, however, provided only one concrete instance in which Dr. Bolanos made such statements. Plaintiff recalled that, when he met with Dr. Bolanos for the first time after he had started his job, Pl.'s Ex. 9 at 46-47, Dr. Bolanos commented that young people "are such a breath of fresh air" and "eager to please," while older employees are more "difficult to work with" and "stubborn," *id.* at 47; *see also* Pl.'s Steele Dep. at 40. Dr. Bolanos then allegedly negatively referred to an administrative employee in her 50s, describing to Plaintiff how CISA had fired the woman, but then was forced

to rescind the termination decision after she filed an EEO complaint. Pl.'s Ex. 9 at 48; Pl.'s Steele Dep. at 40.

Dr. Bolanos denies making such statements. Pl.'s Opp'n, Ex. 10, August 31, 2012, Fact-Finding Conference, ECF No. 28-13 [hereinafter Pl.'s Ex. 10], at 12-13. At the summary judgment stage, however, the court must draw all credibility determinations in favor of the non-movant and thus assumes that Dr. Bolanos made the statements attributed to her. Nevertheless, those statements are not the kind of direct evidence of discrimination that would entitle Plaintiff, without more, to get to a jury. "Direct evidence does not include stray remarks in the workplace, particularly those made by non-decision makers or statements made by decision makers unrelated to the decisional process itself." *Waterhouse v. District of Columbia.*, 124 F. Supp. 2d 1, 12 (D.D.C. 2000), *aff'd* 298 F.3d 989 (D.C. Cir. 2002) (citing *Kalekiristos v. CTF Hotel Mgmt. Corp.*, 958 F. Supp. 641, 665 (D.D.C.), *aff'd without op.*, 132 F.3d 1481 (D.C. Cir. 1997) (citations omitted)); *Siragy v. Georgetown Univ.*, 1999 WL 767831, at *6 (D.D.C. 1999); *cf. Wilson v. Cox*, 753 F.3d 244, 247 (finding that two separate statements made by decision-maker regarding employment were sufficient to constitute direct evidence of age discrimination); *cf. Morris v. McCarthy,* --- F.3d ---, 2016 WL 3254902 at *5 (D.C. Cir. June 14, 2016) (noting that "[a]lthough . . . an isolated race-based remark unrelated to the relevant employment decision could not, without more, permit a jury to infer discrimination, . . ., [the Court of Appeals] ha[s] not categorically labeled such comments immaterial" and instructing courts to consider such statements "alongside any additional statements—and all other evidence—to determine whether a plaintiff has met her burden").

Dr. Bolanos' statements do not constitute direct evidence of discrimination for two reasons. First, Plaintiff does not dispute that only Colonel Bell, Dr. Hanlon, and Admiral Rondeau were

involved in the decision to terminate him and that Dr. Bolanos was not involved. DSMF ¶ 22; PSMF ¶ 22. Nor has Plaintiff argued that Dr. Bolanos had any input into the decision. *See Forman v. Small*, 271 F.3d 285, 293 (noting that when "decision makers, or those who have *input* into the decision, express such discriminatory feelings around the relevant time in regard to the adverse employment action . . . then it may be possible to infer that the decision makers were influenced by those feelings in making their decisions" (emphasis added)). Thus, any statements attributable to Dr. Bolanos cannot constitute direct evidence of discrimination because they were not made by someone who participated in the decision to terminate Plaintiff's employment. *See Holbrook v. Reno*, 196 F.3d 255, 260 (D.C. Cir. 1999) (holding that there was no direct evidence of discrimination where there was no evidence that the statements at issue were made by an individual involved in the employment decision); *cf. Wilson*, 753 F.3d at 247 (finding that statements could serve as direct evidence where they came from the person who made the decision that caused the plaintiff's termination).

Second, Dr. Bolanos' alleged statements were no more than "stray remarks . . . unrelated to the decisional process." *Waterhouse*, 124 F. Supp. 2d at 12. Dr. Bolanos allegedly uttered the ageist statements at the very start of Plaintiff's employment and therefore long before the issue whether to terminate him or someone else arose. That such statements might, in fact, have been made does not "alone . . . carry enough weight to establish evidence of age discrimination on the part of the defendant." *Siragy*, 1999 WL 767831 at *6 (holding that similar statements were not evidence of direct discrimination where they were infrequent and made by an employee with little to no role in the termination decision at issue); *Newman v. D.C. Courts*, 125 F. Supp. 3d 95, 105 (D.D.C. 2015) (finding that "stray remarks" "unrelated to the decisional process itself" do not constitute direct evidence of discrimination).

## 2. *Circumstantial Evidence of Discrimination*

Because there is no direct evidence sufficient to permit Plaintiff to reach trial, the court begins its review of Plaintiff's circumstantial evidence. This often would mean that the court would turn to the *McDonnell Douglas* framework.[8] In this case, however, because Defendant has offered a legitimate, non-discriminatory reason for Plaintiff's termination—budget cuts resulting in the decision to reduce probationary staff, Def.'s Mem. at 5-7—the court need not, and in fact should not, "decide whether the plaintiff actually made out a prima facie case," *Brady*, 520 F.3d at 494 (D.C. Cir. 2008). "[O]nce the employer asserts a legitimate, non-discriminatory reason, the question whether the employee actually made out a prima facie case is 'no longer relevant' and thus 'disappear[s]' and 'drops out of the picture.'" *Id.* at 493-94 (quoting *Reeves*, 530 U.S. at 143).

Plaintiff thus has the burden of demonstrating to the court that he has "produced sufficient evidence for a reasonable jury to find that [Defendant's] asserted non-discriminatory reason was not the actual reason" for terminating his employment and that Defendant "intentionally discriminated against [Plaintiff]" on the basis of age. *Brady*, 520 F.3d at 494 (citations omitted). To make this determination, the court reviews three categories of evidence: (1) Plaintiff's *prima facie* case; (2) evidence indicating that Defendant's proffered non-discriminatory reason is pretextual; and (3) any other evidence of discrimination. *Hamilton*, 666 F.3d at 1351 (citations omitted); *see also Nurriddin*, 818 F.3d at 759.

### a. *Prima facie* case

The elements of a *prima facie* case under the ADEA are as follows: (1) the plaintiff is a

---

[8] Although Defendant initially contended that summary judgment in its favor was warranted because Plaintiff had not made out a *prima facie* showing under *McDonnell Douglas*, Def.'s Mem. at 20-21, Defendant ultimately conceded that its argument rested on an incorrect reading of the law and withdrew it, Reply, ECF No. 31, at 7 ("[T]he articulation of [Defendant's] justification removes the existence of [a] *prima facie* case from the analysis under this Circuit's refinement of the *McDonnell Douglas* framework. . . . Consequently, Defendant no longer relies on the alleged lack of a *prima facie* case as a basis for awarding summary judgment.").

member of the protected class (*i.e.*, is over 40 years old); (2) was qualified for the position; (3) suffered an adverse employment action; and (4) was disadvantaged in favor of a significantly younger person. *Martin*, 78 F. Supp. 3d at 294-95; *O'Connor*, 517 U.S. at 310-13. At this stage in the proceedings, however, the court is not looking for the mere existence of a *prima facie* case. Instead, it weighs the evidence put forth to establish the *prima facie* case as part of its evaluation of the overall sufficiency of the evidence supporting discrimination.

Here, the court finds that the evidence supporting a *prima facie* case of age discrimination is weak. The first three elements of Plaintiff's *prima facie* case clearly are present—(1) Plaintiff is older than 40; (2) he was qualified for the position at CISA; and (3) he suffered an adverse employment action. But the fourth element—that Plaintiff was disadvantaged in favor of a significantly younger person—is not as evident.

Plaintiff largely relies on allegedly similarly situated employees to establish the fourth *prima facie* element. *See generally* Pl.'s Am. Compl.; Pl.'s Opp'n; *see also Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296-97 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 1685 (2016) (noting that evidence indicating that favorable treatment of similarly situated persons outside the protected class can be "probative of discrimination"); *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005) (finding that a plaintiff can create an inference of discrimination to support her *prima facie* case by, among other techniques, "demonstrating that she was treated differently from similar situated employees"). Plaintiff attempts to show that he was disadvantaged in favor of a significantly younger person because younger employees were retained by CISA while two older employees were terminated. Pl.'s Opp'n at 11.

Yet to raise an inference of discrimination based on such evidence, all relevant aspects of each individual's employment situation must be "nearly identical." *Burley*, 801 F.3d at 301. On

closer examination, as discussed in the next section, the similarly situated employees identified by Plaintiff are *not* highly similar to Plaintiff in important respects, undermining the strength of Plaintiff's *prima facie* case. *See Coleman v. Donahoe*, 667 F.3d 835, 857-58 (7th Cir. 2012) (citations omitted) ("Our precedents [ ] teach that the similarly-situated inquiry and the pretext inquiry are not hermetically sealed off from one another. We have often noted that 'the prima facie case and pretext analyses often overlap.'").

Nevertheless, because the *prima facie* burden is "not onerous," *Burdine*, 450 U.S. at 253, the court accepts that there has been a *prima facie* showing here—but only a weak one that provides minimal weight to Plaintiff's overall claim of discrimination.

b.      Pretext

A plaintiff successfully can demonstrate that his employer's explanation for an adverse action is pretext "by showing that a non-discriminatory reason offered by a defendant is false, or otherwise presenting enough evidence to allow a reasonable trier of fact to conclude that the employer's proffered explanation is unworthy of credence." *Chavers v. Shinseki*, 667 F. Supp. 2d 116, 124-25 (D.D.C. 2009) (citations and internal quotation marks omitted); *George*, 407 F.3d at 413 (citing *Burdine*, 450 U.S. at 256). A plaintiff must not only show that the reason offered was pretext generally, but more specifically, pretext for discrimination. *Cones v. Shalala*, 199 F.3d 512, 519 (D.C. Cir. 2000); *see also Reeves,* 530 U.S. at 147 ("In other words, it is not enough to *dis* believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination."); *Brady*, 520 F.3d at 494; *Román v. Castro*, No. 12-cv-01321 (CRC), 2016 WL

829874, at *13 (D.D.C. 2016).

In order to show that a reason is not only pretext, but pretext for discrimination, a plaintiff may present evidence that allows "the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves*, 530 U.S. at 147. Such evidence may include:

> the employer's better treatment of similarly situated employees outside the plaintiff's protected group,[9] its inconsistent or dishonest explanations, its deviation from established procedures or criteria, [ ] the employer's pattern of poor treatment of other employees in the same protected group as plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive.

*Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115 (D.C. Cir. 2016) (quoting *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015)) (internal quotation marks omitted). Ultimately, however, where "the employer's stated belief about the underlying facts is reasonable in light of the evidence . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Brady*, 520 F.3d at 495. In other words, "an employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false." *George*, 407 F.3d at 415; *see also Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("Once the employer has articulated a non-discriminatory explanation for its action . . . the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers.").

Plaintiff here faces an even heavier burden of showing pretext than usual. In the higher education setting, employer explanations and decisions are to be given heightened deference. As the Supreme Court has observed, a federal court is ill-suited to "evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions—decisions that require 'an expert evaluation of cumulative information and [are] not

---

[9] Or, here in an ADEA case, better treatment of similarly situated employees who are substantially younger than Plaintiff. *See O'Connor*, 517 U.S. at 312-13.

readily adapted to the procedural tools of judicial or administrative decisionmaking.'" *Elam v. Bd. of Trustees of the Univ. of D.C.*, 530 F. Supp. 2d 4, at 16-17 (D.D.C. 2007) (quoting *Bd. of Curators, Univ. of Mo. v. Horowitz*, 435 U.S. 78, 89-90 (1978)); *cf. Spaeth*, 943 F. Supp. 2d at 210-11 (noting that "triers of fact cannot hope to master the academic fields sufficiently to review the merits of [tenure] reviews and resolve the differences of scholarly opinion"). Accordingly, courts must "show great respect for the faculty's professional judgment" when reviewing a "genuinely academic decision." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985); *Elam*, 530 F. Supp. 2d at 16 (collecting cases to show that "[t]he Supreme Court has cautioned that courts should be especially solicitous of academic decisions in the higher education setting").

Although Plaintiff does not provide evidence directly disputing that Defendant faced budget cuts, *see* n.3, *supra*, he does contend that those alleged budgetary issues were not the real reason for his termination. *See* Pl.'s Opp'n at 8-14; s*ee Cones*, 199 F.3d at 520 (noting that the plaintiff did not dispute that the agency was downsizing, but that "the critical question is what motivated the [employer's] decision not to promote [the plaintiff]—downsizing or discrimination"). As discussed in detail immediately below, upon a thorough review of the evidence, the court finds that there "is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Brady*, 520 F.3d at 495.

### i. Similarly situated individuals identified by Plaintiff

To prove that Defendant's explanation is pretext and raise an inference of discrimination, Plaintiff—as he did when establishing his *prima facie* case—heavily relies on comparisons between himself and other CISA employees. Plaintiff suggests that employment decisions made by CISA in regard to these other employees demonstrate that Defendant (through Colonel Bell and Dean Hanlon) made its employment decisions based on age, rather than economic necessity.

These comparisons prove inapt, however, due to important differences in the employment situations of Plaintiff and the other individuals.

In order to successfully use similarly situated individuals to establish pretext and thus raise an inference of discrimination, a plaintiff must establish that "all of the relevant aspects of her employment situation were nearly identical to those" of the comparators. *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (finding that two individuals were not similarly situated where others had testified that their behavior in the office was different and where the two individuals had different levels of seniority). For example, the comparators "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Waterhouse*, 124 F. Supp. 2d at 14 (quoting *Phillips v. Holladay Prop. Servs., Inc.*, 937 F. Supp. 32, 37 (D.D.C. 1996)) (internal quotation marks omitted); *see also, e.g.*, *Elam*, 530 F. Supp. 2d at 15 (comparing academic and professional credentials, as well as disciplinary focus, of possible comparators who worked at a university); *Guerrero v. Univ. of D.C.*, 251 F. Supp. 2d 13, 24 (noting that the discipline in which one teaches and the salary and rank of one's position are important factors to consider when determining if individuals are similarly situated); *cf. Burton v. District of Columbia*, Civ. No. 10-1750 (BAH), 2015 WL 9907798, at *42, 44, 51 (finding that where the evidence presented provided minimal information about proposed comparators' race, rank, past offenses, and disciplinary history, individuals were not similarly situated). Whether employees are similarly situated ordinarily presents a question of fact for the jury. *See Wheeler*, 812 F.3d at 1116. At the summary judgment stage, however, "[i]f a reasonable jury would be unable to find that the plaintiff and the comparator were similarly situated, the court may decide, as a matter of law, that the two

are not similarly situated." *See Burton*, 2015 WL 9907798 at *40 (citing *George*, 407 F.3d at 414-15).

In addition, a plaintiff in an ADEA case must show that he was disadvantaged in favor of a substantially younger person. Or, to put it in other terms, a plaintiff must show that a "substantially younger . . . employee[ ] [was] treated more favorably." *Clifton v. Fed. Nat'l Mortg. Ass'n*, 36 F. Supp. 2d 20, 25 (D.D.C. 1999). This means that a plaintiff, when attempting to show pretext in an ADEA case, can demonstrate such pretext by showing that a substantially younger employee was advantaged by the plaintiff's termination. *Cf. Martin*, 78 F. Supp. 3d at 293 ("A plaintiff can demonstrate that the employer's stated reason was not the actual reason by producing evidence suggesting that the employer treated other employees of a different . . . sex . . . more favorably in the same factual circumstances or by showing that the employer is making up or lying about the underlying facts." (quoting *Brady*, 520 F.3d at 495) (internal quotation marks omitted)). Thus, in addition to ensuring that a proposed comparator is similarly situated to a plaintiff generally, a court must assess the relevance of a comparator by "looking at the employee most similarly situated to the plaintiff, and examining the age disparity, if any, between the plaintiff and that 'comparator' employee." *Clifton*, 36 F. Supp. 2d at 25.

Plaintiff contends that "Associate Professors under the age of 40 were not terminated or forced to resign during the relevant time period" and "were not subject to the age discrimination to which [Plaintiff] was subjected." Am. Compl. ¶¶ 48, 51. In support of this claim, he references a wide variety of colleagues. Pl.'s Opp'n at 9-13. Most of these comparators can be categorized into two main groups: (1) fellow probationary employees and (2) employees hired after his termination. The court considers each in turn.

a)        Probationary employees

Because the Court of Appeals has held that "probationary employees and permanent employees [within the federal government] are not similarly situated . . . [because] probationary employees may be terminated for problems even if those problems would not be good cause for terminating a permanent employee," *George*, 407 F.3d at 415, the court reviews that subset of employees separately from other allegedly similarly situated employees.   This focus on probationary employees is particularly appropriate here, where CISA decided that in addressing the need for budget cuts it would consider only probationary employees for termination.  Def.'s Bell Dep. at 24.  Although Plaintiff contends that CISA did not have to consider only probationary employees as candidates for termination, Pl.'s Bell Dep. at 41, he offers no proof that the decision to focus the budget cuts only on probationary employees was motivated by discrimination.  Each of the five[10] probationary employees offered by Plaintiff as comparators have distinctive characteristics that call into question their similarity—and thus their comparability—to Plaintiff.

First, two of the probationary comparators cited by Plaintiff—Jay Parker (who was retained) and Art Westneat (who was terminated)—are older than Plaintiff.  Parker, born in 1952, is approximately 11 years older than Plaintiff.  Westneat, born in 1947, is approximately 16 years older than Plaintiff.  Therefore, neither person can function as a comparator, because they provide no evidence that a substantially younger person was advantaged over Plaintiff.  *Cf. Martin*, 78 F. Supp. 3d at 293.

Second, one employee offered by Plaintiff as a possible comparator—John Harrison (who was retained)—is not "substantially younger" than Plaintiff.  Defendant's internal employment

---

[10] Although both Plaintiff and Defendant recognize Seth Malaguerra as a younger probationary employee who was terminated by CISA, Plaintiff does not contend that Malaguerra is similarly situated to him.  In fact, he argues the opposite—that Malaguerra should not serve as a comparator.  PSMF ¶ 18.  Therefore, the court does not address Malaguerra's relevance as a comparator.

records show that Harrison was at least 41 years old at the time of Plaintiff's employment, Pl.'s Opp'n, Ex. 27, ECF No. 28-30 [hereinafter Pl.'s Ex. 27]. In this Circuit, an age difference of six years cannot provide support for an inference of discrimination. *Breen v. Mineta*, No. Civ. A. 05-654 RWR, 2005 WL 3276163, at *4 (D.D.C. Sept. 30, 2005) ("[A]n age difference of less than ten years is not sufficient to support a prima facie inference of age discrimination."); *Dunaway*, 310 F.3d at 767 (finding seven years difference in age to be insufficient to support a *prima facie* inference of discrimination).

The two remaining probationary employees who were considered for termination but not released—Hans D. Ucko[11] and Paul Miller—both are significantly younger than Plaintiff and thus are potential comparators. Ucko is 16 years younger than Plaintiff; Miller is 15 years younger than Plaintiff. *See* Pl.'s Ex. 7. And both men were advantaged over Plaintiff—they, unlike Plaintiff, were permitted to stay in their positions at CISA despite the budget cutbacks. Bell Decl. at 4.

Neither Ucko nor Miller, however, was similarly situated to Plaintiff in important respects. Ucko "supported the International Counterterrorism Fellowship Program and was extremely highly rated." Bell Decl. at 4. Plaintiff, in contrast, does not allege that he similarly served any specific program. Further, unlike the funding for Plaintiff, "[t]he funding for [Ucko's] program remained secure" and was "subject to oversight from the Department of Defense and the Defense Security Cooperation Agency." *Id.*

These distinctions are critical. Employees who serve different programs that are funded in different ways with different oversight are not similarly situated. *See Wheeler*, 812 F.3d at 116 (evaluating employee roles, responsibilities, pay grades, supervisors, offenses to determine if the

---

[11] Mr. Ucko is alternatively referred to as "Ucko" or "Paducko" in the exhibits and pleadings of this case. And his first name is alternately listed as "David" or "Hans D." The court uses the first name and surname listed on Defendant's employment record. Pl.'s Ex. 27.

individuals were similarly situated). Employers are allowed to consider such distinctions when making employment decisions, as Colonel Bell describes doing here. Bell Decl. at 4-5. And the court must defer to the employer's evaluation of these differences. *See Fischbach*, 86 F.3d at 1183 (noting that a court "may not second-guess an employer's personnel decision absent demonstrably discriminatory motive" (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)) (internal quotation marks omitted)). Ucko, therefore, was not similarly situated to Plaintiff and cannot be used as comparator.

Miller also was not similarly situated to Plaintiff. Miller had particular skills and experiences that Plaintiff did not have—such as military experience in Afghanistan, time at the National Security Council as the Director for Afghanistan, and experience with the Central Intelligence Agency pertaining to Afghanistan——which allowed him to fill a unique role in a specific CISA program known as AFPAK Hands. Bell Decl. at 4; Def.'s Bell Dep. at 17-20; *see also* Def.'s Steele Dep. at 27 (agreeing that experience in Afghanistan would be useful for the AFPAK Hands program); DSMF ¶ 13; PSMF ¶ 13. These types of distinctions in expertise and experience are particularly relevant in the academic context. *See, e.g.*, *Elam*, 530 F. Supp. 2d at 15 (comparing academic and professional credentials, as well as disciplinary focus, of possible comparators who worked at a university); *Guerrero*, 251 F. Supp. 2d at 24 (noting that the discipline in which one teaches and the salary and rank of one's position are important factors to consider when determining if individuals are similarly situated).

In short, not one probationary employee who was advantaged by Defendant's decision to terminate Plaintiff is both substantially younger than Plaintiff *and* similarly situated to him. Thus, the court concludes that no reasonable jury could find that comparison of Plaintiff with the other

probationary employees would provide sufficient evidence to indicate that Defendant's reason for Plaintiff's termination was pretext—particularly in the context of higher education.

b) Employees hired soon after Plaintiff's termination

Plaintiff also claims that there is evidence of pretext in that several "individuals who were under 40 were hired as faculty members shortly after [Plaintiff] was terminated." Pl.'s Opp'n at 10.[12] These individuals were Gregory Gresh; Jeffrey Meiser; Heather Greg; Elena Pokalova; and Barrack Salmoni.[13] *Id.*; Def.'s Mem. at 10. In response, Defendant argues that none of these employees were similarly situated to Plaintiff. Upon review of the evidence, the court agrees with Defendant.

Two of the individuals—Gresh and Meiser—"each had different teaching specialties than Plaintiff and worked in a different department than Plaintiff." Def.'s Mem. at 24 (citing Bell Decl.). According to Colonel Bell, when "last minute reductions across NDU enabled the hiring of two expert faculty members," CISA chose to hire instructors specifically "to support the South and Central Asia Security Studies Program." Bell Decl. at 5. The court is not in a position to question Defendant's determination that Gresh and Meiser were the best candidates to fill those needs. *See, e.g.*, *Elam*, 530 F. Supp. 2d at 15.

Two other individuals—Greg and Salmoni—cannot be used as comparators with Plaintiff because Plaintiff has not shown that they were substantially younger than he. Plaintiff provided no evidence of Greg's age or when she was hired. As discussed above, the court need not credit an assertion lacking such important details. *Jones*, 565 F. Supp. 2d at 78. Plaintiff does provide evidence regarding Salmoni's age—he concedes that Salmoni was in his 40s. Pl.'s Steele Dep. at

---

[12] Plaintiff's specifically-funded position was not filled until August 2013. The new hire, William "Tony" Rivera, is approximately the same age as Plaintiff. Bell Decl. at 5.
[13] Mr. Salmoni is also referred to as "Baraksoc Solony." The court refers to Salmoni by the name used by Colonel Bell—his employer—in Colonel Bell's Declaration. *See* Bell Decl. at 5.

73.  At most, therefore, Plaintiff was seven years older than Salmoni.  That is not a substantial age difference and therefore Salmoni also is not an appropriate comparator.  *Dunaway*, 310 F.3d at 767.

Finally, Pokalova was hired through and worked as a contractor for Booz Allen at the time Plaintiff was released.[14]  Def.'s Steele Dep. at 30-31.  As a contractor, her position apparently did not count against the hiring cap on full-time equivalent government employees.  *See* Bell Decl. at 3 (stating that another employee could be hired as a Booz Allen contractor despite a hiring cap being in place, but could not be hired as a government employee until the hiring cap had more flexibility); Pl.'s Bell Dep. at 35 (describing the hiring cap).  She thus was not similarly situated to Plaintiff.

Plaintiff does not dispute these facts regarding his proposed comparators, but rather points to the allegedly inferior academic qualifications of several of them, presumably to discredit Defendant's hiring decisions.  Pl.'s Opp'n at 10.  Plaintiff's own perception of his allegedly superior qualifications, however, is insufficient to establish an inference of discrimination. *Waterhouse*, 124 F. Supp. 2d at 5 (D.D.C. 2000) (finding that plaintiff's self-serving statements as to her competence or superior performance did not raise material issues of fact regarding defendants' proffered reasons for plaintiff's termination).  Again, this is particularly true in the context of higher education.  *Elam*, 530 F. Supp. 2d at 17-18.

### ii.  *Shifting explanations for Defendant's termination*

Plaintiff also appears to make the argument that evidence of pretext can be inferred from Defendant's allegedly shifting explanations for his termination.  Pl.'s Opp'n at 4 (alleging that "[a]fter his termination, [Plaintiff] was told that he was terminated because he was an

---

[14] Salmoni also worked as a contractor.  Bell Decl. at 5. Therefore, in addition to not being substantially younger than Plaintiff, he, like Pokalova, also cannot be used as a comparator because of his position as a contractor.

'irresponsible professor'"); Pl.'s Opp'n at 9 (noting that "shifting explanations . . . creates an inference of pretext" (citing *Jones*, 565 F. Supp. 2d at 80)); Pl.'s Disputed Facts ¶¶ 3, 55. In support of this claim, Plaintiff cites to his deposition, interrogatory answer, and interview during the EEO fact-finding process; several course evaluations; an email and a letter from two students; and a statement from Dr. Bolanos made during her fact-finding testimony. Pl.'s Disputed Facts ¶¶ 3, 55.

On closer inspection, none of these citations provides support for Plaintiff's allegation of shifting explanations. The course evaluations and student letters might show that Plaintiff was well-liked as a teacher, but they provide no indication that Defendant ever asserted that Plaintiff was being terminated due to his teaching performance. The statement from Dr. Bolanos, made in the course of EEO fact-finding, merely says "there was a decision made that maybe [Plaintiff] was possibly not the best match for the organization." Pl.'s Ex. 10 at 9. It does not claim anything about the underlying reasons regarding why Plaintiff was not the best match. Nor do Plaintiff's testimony or interview answers aid his argument. The only comment that provides a hint of evidence of shifting explanations is found within Plaintiff's fact-finding interview, during which he alludes to a letter from Colonel Bell's office to the Joint Chiefs of Staff which allegedly "conclud[es] that [Plaintiff] was a very irresponsible professor." Pl.'s Ex. 9 at 33. This comment appears to reference a memo written on August 30, 2011, which was designated by Plaintiff as an exhibit. *See* Pl.'s Opp'n, Ex. 20, ECF No. 28-23. This memo, however, nowhere states that Plaintiff was terminated because he was an irresponsible professor. *Id.* Rather, it reiterates Defendant's consistent claim that Plaintiff's termination was due to budget cuts. *Id.* In short, Plaintiff has not offered sufficient evidence of shifting explanations for his termination to support a showing of pretext.

c.    Other evidence

In addition to evidence supporting a plaintiff's prima facie case and pretext, the court also must review "any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer." *Aka*, 156 F.3d at 1289.  Among other possibilities, this "further evidence" may include "independent evidence of discriminatory statements or attitudes on the part of the employer" or "evidence of a strong track record in equal opportunity employment." *Id.*  Here, both parties offer several types of evidence, as discussed below.  Upon review, the court finds that this "other evidence" also cannot support a reasonable inference of discriminatory intent.

i.    *Statistical evidence of a pattern of discriminatory practices*

Plaintiff attempts to use statistical evidence to show that "[i]t is undisputed that younger individuals were more favorably treated and were sought after by CISA." Pl.'s Opp'n at 9.  "As evidence of the Agency's preference for younger faculty," he states, "in 2011, the Agency had 6 faculty members under 40 and 25 faculty over 40. . . .  In 2012, the amount of faculty members under 40 increased to 15 and the number of faculty member[s] over 40 decreased to 13." *Id.*; *see also* Pl.'s Opp'n, Ex. 24, ECF No. 28-27.  After "a simple average calculation," Plaintiff testified that "the best conclusion [he] reached is that not a single person below the age of 40 has ever been terminated from CISA as a faculty member." Pl.'s Steele Dep. at 97.

Generally, statistical calculations can be used to demonstrate pretext. *Jones*, 565 F. Supp. 2d at 78; *Forman*, 271 F.3d at 292. That does not mean, however, that evidence of statistical disparity is dispositive in the context of a summary judgment motion or that a court cannot evaluate the weight of the statistical evidence within its review of the evidence as a whole. *Shea v. Kerry*, 961 F. Supp. 2d 17, 48 (D.D.C. 2013), *aff'd*, 796 F.3d 42 (D.C. Cir. 2015) (emphasizing the

"rigorous, exacting analysis courts in this circuit have applied to this kind of statistical evidence"); *Burton*, 2015 WL 9907798 at *41 (finding a statistical report to be insufficient to show that any individual plaintiff was subject to disparate disciplinary action). Nor must a court permit clearly deficient statistical evidence to go to a jury. *See Burton*, 2015 WL 9907798 at *41 (noting in the court's discussion of statistical evidence that "to survive summary judgment, the plaintiffs must each point to *competent* record evidence" (emphasis added)).

Here, several factors lead the court to conclude that the statistical evidence proffered by Plaintiff is not a useful indicator of discrimination. First, the statistics directly compare employees above the age of 40 with employees under the age 40. As Defendant rightly contends, this is "the very type of analysis rejected by the Supreme Court." Def.'s Reply, ECF No. 31, at 9. A simple comparison of the numbers of employees above 40 and below 40 does not provide any evidence regarding how employees were treated in comparison to one another, show differences in the treatment of employees in the above-40 age group with those in the under-40 age group, or identify if there were significant age differences between employees who allegedly were treated differently from one another. *See O'Connor*, 517 U.S. at 312 (noting the lack of probative value in an ADEA case that someone inside the protected class was replaced by someone outside the protected class). Absent such additional facts, the statistical evidence has little value.

Second, "[t]he case law in this circuit overwhelmingly finds that this kind of [statistical] analysis requires proof as to its statistical significance." *Shea*, 961 F. Supp. 2d at 47. Plaintiff has provided no such proof. He calculated the statistics himself, but has not offered evidence that he has any sort of specialized skill or knowledge of statistics. *Cf. Jones*, 565 F. Supp. 2d at 78 (using statistical evidence, calculated and provided by an expert, to establish pretext). Nor has he addressed if and how his statistical calculations account for issues such as retirement; the range of

ages, experiences, and skills available in the hiring pool; employees who "aged out" of the under-40 group into the over-40 group; or changes in the administrative staff responsible for making employment decisions. *Burton*, 2015 WL 9907798 at *41 (highlighting the need for statistical evidence to be *competent* record evidence). *But see Jones*, 565 F. Supp. 2d at 78 ("[A]ny dispute regarding the reliability of the data hardly defeats the sufficiency of plaintiff's showing of pretext; rather, at best, it only raises an issue of fact for the jury.").

Finally, Plaintiff's statistical calculation does not highlight any information specific to the decision to terminate Plaintiff and therefore is minimally useful. *Burton*, 2015 WL 9907798 at *41 (noting the need for a plaintiff to prove that she in particular was subject to discrimination). Due to the obvious deficiencies in Plaintiff's "statistical analysis," no reasonable jury could find that such analysis weighs in favor of Plaintiff's discrimination claim.

## ii. *Anecdotal evidence of discrimination*

Plaintiff also offers several types of anecdotal evidence to support his discrimination claim. First, as discussed above, Plaintiff asserts that Dr. Bolanos, his first level supervisor, made negative comments that demonstrated "dislike for certain older employees" at Plaintiff's first meeting with her after he was hired. *See supra* at 13-15; Pl.'s Steele Dep. at 35-36. But the same factors that prevent those comments from serving as direct evidence of discrimination—it was a stray remark spoken by someone without the power to make the employment termination decision—also lessen its value as circumstantial proof of discrimination.

Second, Plaintiff claims that he was a "'place holder' for [CISA] to keep [his] position funded while waiting to hire younger individuals who had not either earned their Ph.[D]. or not gone far enough into the Ph.D. process to hire." Pl.'s Opp'n at 13. Plaintiff's own self-perception

of why he was hired—standing alone without corroboration—does not offer any credible evidence of discriminatory intent.

Third, Plaintiff cites to the testimony of Sheila DeTurk, who worked with Dean Hanlon, as evidence that Dean Hanlon manifested age-based bias in her employment decisions. In testimony during the EEO process, DeTurk described conflict between Dean Hanlon and some of the staff, including herself. According to DeTurk, Dean Hanlon would "bully and demean staff" and roll her eyes when DeTurk was speaking with her or when Tom Marks, an older professor with hearing aids, could not hear her. Pl.'s Opp'n, Ex. 5, October 12, 2012, Fact-Finding Conference, ECF No. 28-8 [hereinafter Pl.'s Ex. 5], at 8-9. Further, DeTurk testified that Hanlon had a "cadre of favorites who all tended to be young women in their . . . mid to late 20s, maybe early 30s," *id.*, and that there seemed "to be a pattern" of older professors who were let go, specifically naming three professors in addition to Plaintiff, *id.* at 10, 13. Because DeTurk spoke to her own experience with Dean Hanlon's alleged age bias, and Dean Hanlon was one of the administrators who determined that Plaintiff should be discharged, these statements are among the stronger evidence put forth by Plaintiff.

Nonetheless, DeTurk's testimony is not so significant that it can save Plaintiff's case, particularly when viewed against the entirety of the evidence presented. During her interview before the EEO investigator, DeTurk was directly asked if she "believe[d] that Dr. Steele has been subjected to a hostile work environment because of his age[.]" Pl.'s Ex. 5 at 12. Her response? "It's hard for me to say that it's due to age. As I say, [Dean Hanlon's] a bully, she would lie, she was inconsistent the way she treated people, she had her favorites. And then once you were not on the favorite list, you were basically doomed." *Id*. DeTurk continued:

> So yeah, as I say, there was a pattern of . . . this thing with the older professors . . .
> But as I say, she was sometimes an equal opportunity, meaning she was mean to

> some younger employees too. We had some young Booz Allen employees; she
> was very mean and nasty to them as well.

*Id*. at 12-13. In other words, DeTurk's testimony as much suggests that Dean Hanlon was generally difficult to get along with as it suggests that Dean Hanlon specifically discriminated against employees based on their ages. When asked specifically about Dean Hanlon's behavior toward Plaintiff, DeTurk could not attest that she believed that ageism caused the behavior. *Id*. at 12. At best, then, DeTurk's testimony has a neutral effect on the sum of evidence in support of Plaintiff's discrimination claim.

Finally, in his deposition, Plaintiff testified that Art Westneat, another probationary employee over the age of 40, told him, a year after they both were terminated, that "he [Westneat] suspect[ed]" that he also was removed due to his age. Pl.'s Steele Dep. at 38; Def.'s Mem. at 10. Such speculative, third-party hearsay is inadmissible, *see* Fed. R. Evid. 802, and, even if it were, has little probative value absent some additional context about Westneat's termination.

### iii.    *Miscellaneous counter-evidence*

Plaintiff's evidence of discrimination suffers not only from its own inherent weakness, but also from uncontested counter-evidence offered by Defendant. For example, NDU sought a waiver to avoid terminating staff, including Plaintiff, which would seem to indicate that the reduction in force was not a pretext to terminate older professors. DSMF ¶ 17; PSMF ¶ 17; Def.'s Bell Dep. at 91-92; Pl.'s Bell Dep. at 34. And Dean Hanlon, who both was over the age of 40 and the supervisor involved in the decision to fire Plaintiff in August 2010, was among the people who decided to hire Plaintiff in the first place, DSMF ¶ 4; PSMF ¶ 4, a fact that raises an inference of non-discrimination. *Waterhouse*, 124 F. Supp. 2d at 12-13.

Finally, other evidence shows that the very same decision-makers who terminated Plaintiff—Colonel Bell and Dean Hanlon—also took many positive employment actions in regard

to faculty over the age of 40.  *See generally* Bell Decl; Def.'s Mem., Decl. of Querine Hanlon, ECF No. 25-9.  Such actions do not necessarily prove that CISA's employment decisions are without any discriminatory bias, but they do provide counter-evidence to Plaintiff's assertion that Defendant has engaged in a pattern of discriminating against employees based on age.

*          *          *

In sum, Plaintiff has the burden of demonstrating to the court that he "produced sufficient evidence for a reasonable jury to find that [Defendant's] asserted non-discriminatory reason was not the actual reason" for terminating his employment and that Defendant "intentionally discriminated against [Plaintiff]" on the basis of age.  *Brady*, 520 F.3d at 494 (citations omitted).  Plaintiff has not met his burden.  His *prima facie* case features weak comparators that barely move the dial in his favor.  He has not provided significant evidence of pretext that would indicate that Defendant made anything other than a rational decision based on economic and academic needs.  And the other anecdotal evidence of discrimination presented by Plaintiff provides minimal evidence of discrimination—either against Plaintiff in particular or as a practice at CISA more generally.  Therefore, the court concludes that no reasonable jury could find that Defendant intentionally discriminated against Plaintiff on the basis of age.  *See, e.g.*, *Vickers v. Powell*, 493 F.3d 186, 195 (D.C. Cir. 2007) (holding that plaintiff's Title VII discrimination and retaliation claims failed because of the relative weakness of her *prima facie* cases and because she had not shown that the legitimate, non-discriminatory reason offered by her employer was pretext for discrimination).  Accordingly, the court grants summary judgment in favor of Defendant on Plaintiff's discrimination claim.

## B.    Retaliation Claim

The ADEA not only bans discrimination on the basis of age but also prohibits retaliatory behavior by an employer against an employee who has complained of age discrimination.  *See, e.g.*, *Forman*, 271 F.3d at 299-300 (analyzing a claim of retaliation under the ADEA).  Like a discrimination claim, a retaliation claim may be proven with either direct or circumstantial evidence.  *Nurriddin*, 818 F.3d at 758.  If, as here, a plaintiff proffers only circumstantial evidence, the court's analysis of the retaliation claim follows the familiar framework, described above, that was set forth in *McDonnell Douglas*.

In the retaliation context, a plaintiff's *prima facie* case must show:  "(1) that she engaged in a statutorily protected activity; (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two."  *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985) (citing *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984)).  "To demonstrate a causal connection, a plaintiff must show 'but for' causation—'that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'"  *Román*, 2016 WL 829874 at *10 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013); *Hampton v. Vilsack*, 760 F. Supp. 2d 38, 53 (D.D.C. 2011), *aff'd*, 685 F.3d 1096 (D.C. Cir. 2012) (noting that a retaliation claim will not survive summary judgment if the defendant is able to "demonstrate it would have reached the same decision absent the prohibited discrimination").

As in the discrimination context, where a defendant proffers a legitimate reason for an action that a plaintiff claims was retaliatory, "'a court reviewing summary judgment looks to whether a reasonable jury could infer . . . retaliation from all the evidence,' which includes not only the prima facie case but also the evidence a plaintiff offers to 'attack the employer's proffered

explanation for its action' and other evidence of retaliation.'" *Nurriddin v. Bolden*, 40 F. Supp. 3d 104, 123 (D.D.C. 2014), *aff'd*, 818 F.3d 751 (D.C. Cir. 2016) (quoting *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009)); *see also Morris*, 2016 WL 3254902 at *5 (noting that if the employer provides a legitimate, non-retaliatory reason for the challenged action, the "*McDonnell Douglas* framework falls away and the factfinder must decide the ultimate question: whether the employee has proven intentional . . . retaliation"). "To avoid summary judgment, employees need not necessarily provide evidence beyond that rebutting the employer's stated explanation." *Morris*, 2016 WL 3254902 at *5.

Plaintiff contends that Defendant retaliated against him in response to his filing of an EEO complaint.[15] Am. Compl. ¶¶ 58-67. Specifically, Plaintiff alleges that "[a]fter engaging in protected EEO activity," he was "subjected to adverse actions by the University when it . . . harassed him about his teaching and teaching style, over scrutinized his work product, and proposed his termination and then forced him to resign and made him a 'Do Not Admit.'" Am. Compl. ¶ 62. In his Opposition, Plaintiff slightly modifies these alleged adverse actions, emphasizing that "only shortly after [Plaintiff] made his EEO complaints was he placed on administrative leave, was refused a performance appraisal, placed on Do Not Admit status . . ., and the Agency did not rescind its notion of termination despite additional funding becoming available for more faculty members." Pl.'s Opp'n at 15.

Before turning to the totality of the evidence to evaluate whether it supports Plaintiff's claim of retaliation, the court easily disposes of three of Plaintiff's asserted instances of retaliation. First, Plaintiff's claims that CISA subjected him to retaliatory adverse actions when it harassed

---

[15] The court notes that Plaintiff's Amended Complaint includes allegations of retaliation based on the formal EEO complaint. Am. Compl. ¶¶ 58, 60, 67. The formal complaint, however, was not filed until November 2011, so it could not have caused the alleged retaliatory behavior described by Plaintiff. Accordingly, the court bases its analysis solely on the informal EEO complaint filed in July 2011.

him about his teaching style and work product face a timing problem. According to Plaintiff's version of events, almost all of these allegedly harassing events took place before May 2011. Yet Plaintiff did not file his informal EEO complaint until July 2011. Thus, the actions occurring before July 2011 could not have been retaliatory.

And the two instances of alleged harassment that did occur *after* July 2011—both occurring at Colonel Bell's August 2, 2011, meeting with Plaintiff—are not actionable. Both parties agree that Colonel Bell "became angry and pounded on the desk" at the meeting. DSMF ¶¶ 26-27; PSMF ¶¶ 26-27. Such behavior might be considered unprofessional, but it is not sufficiently severe behavior to constitute an adverse action. *See Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008) (noting that "sporadic verbal altercations or disagreements do not qualify as adverse actions for purposes of retaliation claims" (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006))). And Dean Meyer and Dean Deare's physical encounter with Plaintiff as he left the room and the lack of disciplinary action taken against them thereafter— which Plaintiff claims was harassment, Pl.'s Opp'n at 16—also is not actionable. Plaintiff must demonstrate that Dean Meyer and Dean Deare had knowledge of his protected activity. *Mitchell*, 759 F.2d at 86. He has not done so. Both men have filed affidavits stating that they did not have such knowledge. Reply, Ex. 1, ECF No. 31-1, at 1-4. Plaintiff has not provided any evidence to the contrary, except to say that their lack of knowledge is a "red-herring," and that the fact that they were not punished after the event is the real evidence of discrimination. Pl.'s Opp'n at 16. That is not enough.

Second, contrary to what Plaintiff alleges, Defendant's decision not to provide him with a performance appraisal cannot give rise to a claim of discrimination. Such an action is generally not considered to be an adverse employment action as long as it "do[es] not affect the employee's

grade or salary." *Lester v. Natsios*, 290 F. Supp. 2d 11, 28-29 (D.D.C. 2003) (citing *Brown v. Brody*, 199 F.3d 446, 458 (D.C. Cir. 1999). And, even if the lack of a performance appraisal could be considered an adverse employment action in this case, Plaintiff has offered no evidence to contradict Defendant's position that CISA typically did not provide reviews to terminated employees. *See* Pl.'s Opp'n, Ex. 3, ECF No. 28-6 [hereinafter Pl.'s Hanlon Dep.], at 49-50.

With those claims addressed, the court turns to the adverse actions alleged by Plaintiff that could provide the basis for a retaliation claim—that he was placed on administrative leave and Do Not Admit Status. Once again, Defendant has asserted a legitimate, non-discriminatory reason for its allegedly retaliatory actions. Accordingly, "the question whether the employee actually made out a prima facie case is no longer relevant, and thus disappears and drops out of the picture." *Brady*, 520 F.3d at 493-94 (citations and internal quotation marks omitted); *Nurriddin*, 818 F.3d at 758 ("The 'one central inquiry' that remains is whether a reasonable jury could infer retaliation or discrimination from all the evidence." (citation omitted)). Based on its review of the evidence, the court concludes that there is no genuine dispute of material fact that would give rise to a finding that Plaintiff's filing of an informal EEO complaint was the but-for cause of the adverse actions taken by Defendant.

### 1. Prima Face Case

Plaintiff argues that a *prima facie* case is established from the fact that Plaintiff's informal complaint was filed roughly two months before he was placed on administrative leave and Do Not Admit status. Pl.'s Opp'n at 16. He is correct. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (holding that temporal proximity of a few months between protected activity and alleged retaliatory activities can establish causation). That said, a mere proximity of time between the protected activity and the adverse action is insufficient, without more, to withstand summary

judgment. *Talavera v. Shah*, 638 F.3d 303, 313 (D.C. Cir. 2011) ("[P]ositive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine." (quoting *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007)) (internal quotation marks omitted)).

### 2. *Pretext*

Defendant provides a non-discriminatory reason for its decisions to place Plaintiff on administrative leave and Do Not Admit Status: they were reasonable actions prompted "by complaints of CISA employees who complained that Dr. Steele was acting aggressively." Def.'s Mem. at 27; Bell Decl. at 5. In response, Plaintiff argues that Defendant "fails to cite to any portion of the record to support its conclusory statement." Pl.'s Opp'n at 17. This is true—Defendant's briefing does not offer specific citations to the record. Yet the record contains evidence—from several sources—that there were indeed such complaints filed against Plaintiff. Pl.'s Ex. 6 at 126; Def.'s Mem, Investigative File, ECF No. 25-5, at 2.

Although Plaintiff contends that he did not act in a "threatening manner to any of the CISA faculty," Pl.'s Opp'n at 18, whether he actually did or not is not the relevant inquiry for present purposes. The relevant inquiry is "whether the employer honestly believes in the reasons it offers" for the adverse actions. *Fischbach*, 86 F.3d at 1183 (quoting *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992)) (internal quotation marks omitted). Plaintiff has submitted no evidence whatsoever that would give a trier of fact reason to find that CISA did not hold the honest belief that the complaints against Plaintiff were valid. *See George*, 407 F.3d at 415 ("[A]n employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false."); *Bennett v. District of Columbia*, 6 F. Supp. 3d 67, 77 (D.D.C. 2013); *Martin*, 78 F. Supp. 3d 279, 301 (D.D.C. 2015). And an employee, like Plaintiff, who engages in protected activity does not have free reign to violate norms of workplace behavior.

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). Accordingly, based on the evidence presented, no reasonable jury could find that Colonel Bell's decision to place Defendant on paid leave for the last two weeks of his employment and to bar Defendant from campus was a pretext for retaliation.

The only other evidence offered by Plaintiff to prove pretext is that, "although funding and [billets] became open for either Fort Bragg or Fort McNair shortly after August 2011, including for the Fall 2011 semester, the Agency rescinded neither its notice of termination . . . nor offered him one of those positions." Pl.'s Opp'n at 17. Defendant has asserted legitimate funding and academic reasons for choosing each of its new hires. *See supra* 23-27. Further, an employer is not required to rehire an employee terminated for budget reasons when new positions become available. *See, e.g.*, *Ruiz v. Posadas de San Juan Assocs.*, 124 F.3d 243, 251 (1st Cir. 1997) ("[T]he mere fact [the plaintiff] was not rehired does not itself afford a basis for inferring age discrimination."). And Defendant reasonably believed that Plaintiff had behaved in a threatening manner toward his colleagues, which is a reasonable ground on which to refuse to rehire him. *Baloch*, 550 F.3d at 1200 (finding that "[g]ood institutional administration" can justify disciplinary actions); *Forman*, 271 F.3d at 291 ("Consistent with the courts' reluctance to become involved in the micromanagement of everyday employment decisions, the question before the court is limited to whether [the plaintiff] produced sufficient evidence of . . . discrimination, not whether he was treated fairly . . . ."); *Fischbach*, 86 F.3d at 1183 (advising courts to "beware of using 20/20 hindsight—the court must respect the employer's unfettered discretion to choose among qualified candidates").

### 3. Other Evidence

Plaintiff avers that his retaliation claim also rests in part on Defendant's actions when it

"harassed him about his teaching and teaching style [and] over scrutinized his work product." Am. Compl. ¶ 62. As discussed above, those incidents, standing alone, are insufficient to support a claim of retaliation. For the very same reasons, even when viewed in conjunction with the other instances of retaliation claimed by Plaintiff, those incidents do not support a finding of retaliation.

*     *     *

To prove his claim of retaliation, Plaintiff was required to show that CISA "took materially adverse action against him because he participated in protected activity" and that such retaliation "would not have occurred but for the protected activity." *Greer v. Bd. of Trustees of the Univ. of D.C.*, 113 F. Supp. 3d 297, 311 (D.D.C. 2015) (citations omitted) (internal quotation marks omitted). Here, Plaintiff did not succeed on either front. Accordingly, summary judgment will be granted in favor of Defendant on Plaintiff's retaliation claim.

### C.     Hostile Work Environment

Plaintiff also asserts a hostile work environment claim against Defendant, alleging that "Plaintiff's supervisors routinely humiliated Plaintiff and engaged in [a] persistent pattern of severe and pervasive harassment," and "Plaintiff was regularly and continually subjected to harassing conduct that included the adverse actions complained of in this Complaint." Am. Compl. ¶¶ 74-75. He asserts that he "was subjected to harassment because [of] his age . . . and because of his engagement in protected EEO activity." Am. Compl. ¶ 79; *see also* Pl.'s Opp'n at 20-21. Plaintiff asserts both a retaliatory hostile work environment claim and a discriminatory hostile work environment claim. *See Román*, 2016 WL 829874 at *6 (citing *Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011)).

The instances of hostility that Plaintiff cites, however, are exactly the same as those that support—or more accurately, fail to support—his disparate treatment and retaliation claims. Pl.'s

Opp'n at 21. The court has addressed these actions at length and has found that there is no genuine dispute of material fact that these actions were either discriminatory or retaliatory. No reasonable jury, therefore, could infer that the events that occurred at Plaintiff's workplace were sufficiently severe, pervasive, or abusive to create either a retaliatory or a discriminatory hostile work environment. *See Baloch*, 550 F.3d at 1201 (finding that plaintiff's "assertion of pervasive and constant abuse is undermined by the sporadic nature of the conflicts . . . [including] several verbal clashes with his supervisor in the workplace").

## V.    CONCLUSION

For the reasons discussed above, Defendant's Motion to Dismiss is denied as moot and its Motion for Summary Judgment is granted. It is further ordered that Plaintiff's Motion to Strike the exhibits attached to Defendant's reply brief is denied. A separate Order accompanies this Memorandum Opinion.

Dated: June 29, 2016                                   Amit P. Mehta
                                                       United States District Judge