**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **BRETT STEELE,** )<br><br>**Plaintiff,** )<br><br>**v.** )<br><br>**MARK ESPER,**<br>**SECRETARY OF DEFENSE,** )<br><br>**Defendant.** ) | **Civil No. 13-cv-01229 (APM)** |

## FINDING OF FACTS AND CONCLUSIONS OF LAW

### I.    INTRODUCTION

This case arises out of Plaintiff Brett Steele's former employment with the College of International Security Studies ("CISA") at the U.S. Department of Defense's National Defense University.  Dr. Steele filed this civil action against Defendant, the Secretary of Defense in his official capacity, pursuant to the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*  Dr. Steele claims that the ADEA was violated when CISA terminated his employment in favor of retaining and later hiring younger instructors.  In June 2019, the court conducted a four-day bench trial on Dr. Steele's claim.

As required by Federal Rule of Civil Procedure 52(a)(1), the court now makes its Findings of Fact and Conclusions of Law. The court has reviewed the parties' submissions, carefully considered the evidence presented at trial, weighed the credibility of the witnesses, and applied the applicable law.  For the reasons set forth in these Findings, the court finds that Dr. Steele has not met his burden of proving that CISA terminated his employment because of his age. Accordingly, the court will enter judgment in favor of Defendant.

## II.     FINDINGS OF FACT

### A.     CISA Hires Dr. Steele

1.     Dr. Brett Steele has a Ph.D. degree in history of science and technology from the University of Minnesota.  He earned his Master of Science degree in mechanical engineering from Stanford University and his Bachelor of Science degree in mechanical engineering from California Polytechnic State University.  Trial Tr., June 17, 2019 [hereinafter Day 1], at 20–21;[1] Pl.'s Ex. 31.

2.     After earning his Ph.D., Dr. Steele taught history in a wide range of courses at the University of California, Los Angeles.  Day 1 at 23.  He then took a two-year research position at the Massachusetts Institute of Technology ("MIT").  *Id.* at 25.  Following his time at MIT, Dr. Steele worked at the RAND Corporation, a securities studies think tank, for three-and-a-half years.  *Id.* at 26.  While at RAND, Dr. Steele worked on a host of issues, including reforming the military acquisition process, terrorism and counterterrorism strategy, and nation building.  *Id.* at 27.  He then secured employment with the Homeland Security Institute in Washington, D.C., where he researched various homeland security issues.  *Id.* at 28.  He then moved to the Joint Improvised-Threat Defeat Organization as a business development manager.  *Id.* at 28–29.

3.     In early spring 2010, Dr. Steele applied for a teaching position at the College of International Security Studies ("CISA") at the Department of Defense's National Defense University ("NDU").  *Id.* at 29–30.  One of five colleges at NDU, CISA's mission is to prepare and educate civilian and military security professionals from the military branches, federal agencies, and other countries.  CISA has two campuses—one at Ft. McNair in Washington, D.C., and one at Ft. Bragg in North Carolina.  In his application, Dr. Steele highlighted his experience

---

[1] All citations to the trial proceedings are to draft transcripts, as no party ordered a final version.  Where the court quotes to testimony, the court has confirmed the accuracy of the quote with the court reporter.

in using economic modeling to teach and explain terrorism and counterterrorism strategy. *Id.* at 33.

4.    As part of CISA's hiring process, Dr. Steele was asked to make a formal research presentation. *Id.* at 31. Present for this part of the interview process was Dr. Querine Hanlon, the Dean of CISA, who would become Dr. Steele's second-level supervisor. *Id.* at 32. Dr. Steele's application of economic modeling to military strategy was a major discussion topic. *Id.* at 33.

5.    Dr. Steele's interview evidently went well, as he was offered an assistant professorship at CISA. The position, however, would require him, after a year at Ft. McNair, to relocate to Ft. Bragg, as part of a new master's degree program for Special Forces officers and soldiers. *Id.* at 35. Dr. Steele declined because of the distance from Washington, D.C., and because of considerations for his wife's career. *Id.* at 37–38.

6.    Shortly thereafter, Dean Hanlon contacted Dr. Steele and advised him that, as a result of a reorganization, a position had opened up at Ft. McNair in the International Securities Studies Department. *Id.* at 38. Dr. Steele interviewed for the position, CISA offered it to him, and he accepted. *Id.* at 40, 43. During this second interview process, Dr. Steele met for the first time Dr. Alejandra Bolanos, the Associate Dean of CISA and head of the International Securities Studies Department, who would become Dr. Steele's first-level supervisor. Trial Tr., June 18, 2019 [hereinafter Day 2], at 83–84. At the time CISA hired Dr. Steele he was 47 years old. Day 1 at 13 (concession from Defendant's counsel as to Dr. Steele's age).

7.    CISA hired Dr. Steele pursuant to authority contained in 10 U.S.C. § 1595. The offer of employment was for three years, with the first year on probationary status. *Id.* at 41. A CISA employee under § 1595 can be terminated at any time during the probationary term without notice, and this is "a discretionary decision." Trial Tr., June 20, 2019 [hereinafter Day 4],

at 30, 40; Def.'s Ex. 1, ¶ 19.b.  CISA's teaching contracts are for a specific term—three years—to provide flexibility in staffing so that the school can meet changing academic needs and priorities. Day 1 at 204; Day 4 at 30–31.  Dr. Steele testified that he had concerns at the outset about accepting a position with a probationary period, which he discussed with Dean Hanlon.  Day 1 at 41.  Dr. Steele stated that Dean Hanlon assured him that they "only get rid of people from CISA . . . if they really mess up."  *Id.* at 42.  Dr. Steele also testified that because of his concern over the probationary year, he negotiated with Dean Hanlon to be given a formal mid-year review, during which any issues that "CISA management thought would jeopardize [his] ability to . . . pass [his] probationary year," could be addressed and he would be given a chance to correct them.  *Id.* Dr. Steele stated that, based on Dean Hanlon's assurances that people were only let go in their probationary year if "they really do outrageous things," he believed "[t]hat as long as [he] did a competent job teaching, [he] had a really good new career."  *Id.* at 42–43.  Dr. Steele testified that he never received the promised review.  *Id.* at 81.

8.      The funding for Dr. Steele's position came from an interagency memorandum agreement with the U.S. Army special operations command, which was based out of Ft. Bragg, to develop a graduate program for army officers.  Trial Tr., June 19, 2019 [hereinafter Day 3], at 119. Dr. Steele was not aware of the funding source for his position.  Day 1 at 200.

9.      Dr. Steele began teaching in September 2010.  He testified that he did not receive any formal orientation, handbook, or even guidance materials before he commenced teaching.  *Id.* at 47.  The only form of guidance he received was a copy of the syllabus and reading materials. *Id.* at 46.  Concerned about the lack of direction, Dr. Steele requested a meeting with Dr. Bolanos. *Id.* at 47.  The two met.  During that meeting, according to Dr. Steele, Dr. Bolanos "started talking about how wonderful CISA now is now that they're under new management and now that they've

gotten rid of all these older faculty professors." *Id.* at 49. Dr. Steele testified that when he asked

what she meant, Dr. Bolanos explained that

> CISA used to have . . . these older professors who were really difficult to work with, they were very stubborn, they wouldn't take management guidance, it was really hard to work with them. And then they brought in more younger professors and, gosh, was it a breath of fresh air. It just made all the difference.

*Id.*

10. Dr. Steele testified that Dr. Bolanos elaborated with two examples. She described

Dr. Peter Thompson, a younger professor, as "hardworking," "takes guidance," "listens to

management," and a "wonderful guy." *Id.* Dr. Bolanos then compared Dr. Thompson to an "older

administrator," Nadine Jones, in her 50s. According to Dr. Steele, Dr. Bolanos said:

> [S]he's lazy, she likes to play computer games, like solitaire, on office time. She resists work. She is just impossible, so bad that we ended up getting her terminated.
>
> But then because she's black, she was able to raise concerns about this termination with the [Equal Employment Opportunity Commission] office and forced us to rehire her, and yet she's still really lazy and this is really annoying and really bugs me that we have to deal with these lazy, older people. There are still lazy older people that we have to deal with.

*Id.* at 49–50. Dr. Steele testified that he was "shocked" and "really concerned" about these

comments. *Id.*

11. Dr. Bolanos denied making the statements that Dr. Steele attributed to her,

particularly saying that younger employees were a "breath of fresh air." Day 2 at 104–05. She

also denied making any comments along the lines that "newer employees were easier to work with

than older employees." *Id.* at 105.

12. For several reasons, the court does not credit Dr. Steele's version of the

conversation he had with Dr. Bolanos.

a.     First, Dr. Steele clearly embellished his testimony. In no prior statement about the meeting with Dr. Bolanos did Dr. Steele provide the kind of detail that he did at trial. Not in his federal court complaint, in his Equal Employment Opportunity ("EEO") complaint, in interrogatory responses, nor his deposition did he attribute the words he did to Dr. Bolanos during his direct testimony. Day 1 at 10–35. To be sure, Dr. Steele previously stated that Dr. Bolanos had said that she found young people to be a "breath of fresh air," *see* Pl.'s Opp'n to Def.'s Mot. for Summ. J., ECF No. 28 [hereinafter Pl.'s Opp'n], Dep. of Brett Steele, ECF No. 28-1, at 110, but he never attributed to her words like "lazy" and "annoying" in reference to older employees or any particular employee. Nor did he express the idea that Dr. Bolanos was happy to be rid of older professors. Day 1 at 10–35. And he never said anything about Dr. Bolanos referencing an employee's race as the reason that CISA was unable to fire her.

b.     Second, the court finds it implausible that Dr. Bolanos would have expressed herself in the manner that Dr. Steele claims to someone who was, by and large, a stranger to her. Dr. Bolanos had become acquainted with Dr. Steele only through the interview process and at the start of his employment. Day 1 at 40 (Dr. Steele stating that he met Dr. Bolanos for the first time during his second interview). It is far-fetched think that Dr. Bolanos would have made such explicit ageist and racist remarks to a new hire, particularly one that was older than her.

c.     Third, based on their relative demeanors at trial, the court found Dr. Bolanos to be more credible than Dr. Steele. Particularly on cross-examination, Dr. Steele was evasive and not forthcoming with his answers. Dr. Bolanos, by comparison, came across as a candid witness.

13.     The court also heard from Dr. Thomas Blau, a former colleague of Dr. Steele at NDU. Dr. Blau testified that he observed Dean Hanlon making ageist comments towards another

colleague, Dr. Thomas Marks.[2]  Dr. Blau recounted that once, during a meeting when Dr. Marks got up to go to the bathroom, Dean Hanlon asked, "Is that an old guy thing?"  Dr. Blau further testified that Dr. Marks had "very bad hearing" and that Dean Hanlon "mocked him for that," and would "roll her eyes at meetings" because of Dr. Marks's hearing issues.  Dean Hanlon denied mocking Dr. Marks or rolling her eyes.  Day 3 at 52.  She testified that she was close to Dr. Marks, he was a mentor, and she never directed the "old guy thing" statement to Dr. Marks.  *Id.* at 52, 68–69.

        a.      The court is unconvinced based on Dr. Blau's testimony that Dean Hanlon possesses a general bias against older colleagues.  The court found compelling Dean Hanlon's testimony about her relationship with Dr. Marks—including an episode in which she secured the renewal of his contract, *id.* at 98–100—and thus credits her denial of mocking him because of his age.

        b.      Furthermore, Dean Hanlon convincingly established a history of promoting positive employment actions for older faculty and staff, including some during their probationary term, *id.* at 90–94, 100–01, which undermines the notion that she was predisposed to harbor animus against Dr. Steele based on his age.

**B.**    **Conflict Arises Regarding Dr. Steele's Teaching Method**

14.    Over the course of the 2010-2011 academic year, Dr. Steele taught or co-taught several classes:  Geostrategy; Origins of Conflict in War; Strategic Thought; and Information and Cyber Revolutions.  Day 1 at 53, 55, 82.  Early in the spring 2011 semester, conflicts arose between Dr. Steele and his supervisors regarding his teaching methods.

---

[2] References to Dr. Blau's testimony are to his videotaped deposition, which was admitted at trial but not transcribed.

15.     On or about February 20, 2011, Dr. Steele attended a meeting with his supervisors, Dean Hanlon and Dr. Bolanos. *Id.* at 59–60. According to Dr. Steele, although generally complimentary of his teaching, they were critical of his use of certain economic concepts in presenting the Strategic Thought course material, though not of using an economic approach in general. *Id.* at 75, 207–08.

16.     Sometime after Dr. Steele's meeting with Dr. Bolanos and Dean Hanlon, Dr. Bolanos received multiple complaints about Dr. Steele's teaching of Strategic Thought from students; the Strategic Thought course director, Dr. Sean McFate; and Dean Hanlon. Day 2 at 114–15. The concern was that Dr. Steele was relying on economic theories and formulas that were not consistent with the course syllabus, and that his students would be disadvantaged in understanding foundational concepts and taking the final exam. *Id.* at 115–17, 119–21; Day 4 at 55. Dr. Bolanos raised these concerns with Dr. Steele. Day 2 at 56, 118.

17.     Complaints about Dr. Steele's teaching methods persisted after he met with Dr. Bolanos. *Id.* at 122–23. On or about March 18, 2011, Dr. Steele met with Colonel Michael Bell, the Chancellor of CISA, along with Dean Hanlon and Dr. Bolanos, to discuss student and faculty concerns about his teaching methods and organization of the Strategic Thought course. Day 1 at 72–73. According to Dr. Steele, Colonel Bell "expressed very strong reservations about the use of any kind of economic reasoning when teaching the Strategic Thought course." *Id.* at 74. This academic "debate" became heated, *id.* at 77; Day 2 at 126, with Colonel Bell raising his voice and insisting that cost was not a significant consideration in formulating strategy, while Dr. Steele disagreed, Day 1 at 74–75; Day 3 at 114. Nevertheless, the meeting ended on a positive note, Day 1 at 211; Day 2 at 126; Day 3 at 116, and Dr. Steele agreed to follow Colonel Bell's

instruction to de-emphasize economic concepts and to adhere more closely to traditional frameworks, Day 1 at 78.

18. Generally speaking, Dr. Steele received positive teaching evaluations from his students. *See* Pl.'s Exs. 1–3.

### C. Dr. Steele's Termination During His Probationary Period

19. In 2010, NDU experienced a reduction both in its budget and in full-time equivalent positions. Day 3 at 122–23, 184–88 Pl.'s Exs. 8 at 2, 44 at 87; Def.'s Ex. 16. NDU was forced to reduce staff by 17 positions. Day 3 at 28, 156.[3] CISA was tasked with reducing its faculty by three "billets," or full-time equivalent positions. *Id.* at 29–32, 39–42, 57–58, 61–62; Pl.'s Ex. 8 at 2.[4] The positions could be eliminated at either Ft. McNair or Ft. Bragg. Day 3 at 33. CISA administrators, including Colonel Bell and Dean Hanlon, began discussing how to address the budget shortfall and the need to reduce staff in the fall of 2010. *Id.* at 71–75. Among the factors they considered was faculty expertise and matching it with the courses that needed to be taught, both core classes and electives. *Id.* at 80–83.

20. At about the same time NDU and CISA were faced with budget and full-time equivalent reductions, the Chairman of the Joint Chiefs of Staff, Admiral Michael Mullen, tasked Colonel Bell in late 2010 with starting and developing the AFPAK Hands program, a course of study focused on Central Asia and the Middle East. Day 3 at 186, 191–92; Day 4 at 33–35.

---

[3] Certain testimony regarding the budget and position reductions that led CISA to cut three faculty members was supplied by Dean Hanlon. *See* Day 3 at 27–37. Dr. Steele's counsel attempted to impeach Dean Hanlon's testimony with prior sworn testimony from administrative proceedings. *See id.* The court finds that the purported inconsistencies were minimal and therefore did not adversely affect Dean Hanlon's credibility.

[4] Dr. Steele implied that the claimed ordered cuts in funding and full-time equivalent positions did not in fact occur, as evidenced by a lack of paper trail. Day 4 at 108. The court finds otherwise. The court finds the witnesses' testimony on the issue of budget and full-time equivalent reductions to be credible. Moreover, there is no dispute that two others (Dr. Westneat and Malaguerra) were let go due to a reduction in State Department funding. Finally, there is some contemporaneous written evidence to support the existence of budget and position cuts. *See, e.g.,* Pl.'s Ex. 8 at 2 (explaining on August 30, 2011, "CISA was forced to reorganize and cut a minimum of three faculty and staff members to remain within its personnel cap"); Def.'s Ex. 16.

AFPAK Hands was designated a priority program. Day 3 at 191; Day 4 at 33–35, 37. Putting that program together, including course development and hiring faculty, began in the spring of 2011. Day 3 at 193–94; Day 4 at 37.

21.     In the spring of 2011, five CISA employees held probationary status and were considered for discontinuing employment: Dr. Steele, Dr. Art Westneat, Dr. David Ucko, Dr. Jay Parker, Dr. Paul Miller, and Seth Malaguerra. Day 4 at 41. Colonel Bell made the decision to recommend to Admiral Ann Rondeau, the President of NDU, that Dr. Steele, Dr. Westneat, and Malaguerra be terminated, and Admiral Rondeau approved the recommendation. *Id.* at 78; Pl.'s Opp'n, Pl.'s Resp. to Def.'s. Stmt. of Material Facts Not in Dispute, ECF No. 28-2, at 6.

22.     Colonel Bell testified extensively about the facts and circumstances that led to his decision to recommend that Dr. Steele not be retained past his probationary term. The court finds Colonel Bell's testimony to be highly credible and summarizes it below.

a.     In deciding whom he would recommend for termination, Colonel Bell first considered the programs for which funding would cease or had been reduced. Day 4 at 41. Previously, the State Department had funded certain positions at CISA but in April 2011 it decided to stop doing so. *Id.* at 42; Pl.'s Ex. 8 at 2. Dr. Westneat's and Malaguerra's positions were funded by the State Department, so they were logical candidates for termination. Day 4 at 42. Dr. Westneat was about 50 years old at the time; Malaguerra was about 30. *Id.* at 42–43.

b.     Next, Colonel Bell considered the needs of CISA's highest priority program, which was counterterrorism studies. *Id.* at 43. Dr. Ucko was teaching in that area—in a different department than Dr. Steele—and his background was steeped in counterterrorism study. *Id.* at 43–44. The other priority program was AFPAK Hands. Colonel Bell viewed Dr. Miller as the best fit for that program. Dr. Miller had on-the-ground experience in Afghanistan, both with

the U.S. Army and with the CIA, and he had worked on Afghan policy at the National Security Council. *Id.* at 44–45; Day 3 at 208. Colonel Bell asked Dr. Miller to assist in developing the coursework for the AFPAK Hands program. Day 3 at 195.

       c.      That left Dr. Steele and Dr. Parker, and Colonel Bell decided to keep Dr. Parker. Colonel Bell had known Dr. Parker from West Point, where Dr. Parker was a distinguished scholar and administrator. Day 4 at 47. Dr. Parker's ties to West Point also made him a valuable asset to CISA in terms of recruiting new faculty. *Id.* at 47–48. He also was familiar with the accreditation processes, from his experiences at West Point and Columbia University. *Id.* at 48.

       d.      According to Dr. Bell, although Dr. Steele had an impressive background, he had a heavier focus on engineering and less experience leading or teaching as a full-time faculty member as compared to other probationary employees. *Id.* at 48–49. He also did not have the military experience of others. *Id.* at 49. In the end, Colonel Bell decided that Dr. Parker was a "much stronger candidate" to retain. *Id.* Dr. Parker is ten or twelve years older than Dr. Steele. *Id.* In the fall of 2011, Colonel Bell promoted Dr. Parker to department chair. *Id.* at 58.

       e.      In addition to the factors already discussed, Colonel Bell considered other inputs in making his decision. He considered student evaluations, faculty recommendations, and intangible qualities, such as whether "the individuals were good teammates and fit in to the life of the college." *Id.* at 76–77. According to Colonel Bell, had there not been a mandated reduction in the full-time equivalent positions, Dr. Steele would have continued employment at CISA. *Id.* at 78.

f. Colonel Bell is two years older than Dr. Steele. *Id.* at 24. During his time at CISA, he took multiple favorable actions for faculty or staff over the age of 40. *Id.* at 57–58, 71–76.

23. Dr. Bolanos was not involved in the decision to terminate Dr. Steele but did recall discussing with Dean Hanlon when to notify Dr. Steele of that decision. Day 2 at 130–32. Dr. Bolanos did not make a recommendation to Colonel Bell or Dean Hanlon with respect to retaining Dr. Steele. *Id.* at 158; Day 3 at 85. At most, she provided Dean Hanlon with general input about her department's teaching needs and agreed that her department could lose a faculty member without compromising the institution's mission. Day 3 at 84–85. Dean Hanlon did not tell Dr. Bolanos why Dr. Steele was being let go, and Dr. Bolanos did not know why his contract was terminated. Day 2 at 132, 145.

24. Dean Hanlon recommended to Colonel Bell that Dr. Steele be one of the faculty removed. Day 3 at 45–46, 63, 134. According to Dean Hanlon, her recommendation had nothing to do with criticism of Dr. Steele's teaching or his age. *Id.* at 54, 63–64. She testified that a number of factors played a role in her recommendation, including the courses that needed to be taught, class sizes, and faculty-student ratios. *Id.* at 64–65. The court finds Dean Hanlon's testimony on this issue to be credible.

25. On May 18, 2011, Dean Hanlon met with Dr. Steele to inform him that he would be terminated from employment at CISA when the summer semester ended on August 19, 2011. Day 1 at 79–80; Pl.'s Ex. 6. Dr. Bolanos and Dean Herman Meyer, CISA's Dean of Students, also were present at the meeting. Day 1 at 79. Dean Hanlon did not provide a reason for the termination, based on instruction from NDU counsel. Day 3 at 79. Dean Hanlon did say, however,

that Dr. Steele was not being terminated for cause and that she would be willing to write a letter of recommendation for him. *Id.* at 80.

26.    Dr. Steele was shocked by the decision to terminate him. Day 1 at 81. The decision caused him to recall the conversation with Dr. Bolanos about younger faculty and to wonder whether he was being terminated because of his age. *Id.* at 81, 165.

27.    Dr. Steele asked several people at NDU the reason for his termination but to no avail. He wrote to Colonel Bell but did not receive a response. *Id.* at 84; Pl.'s Ex. 7. He also asked Dr. Bolanos in person on several occasions why he was terminated, and she did not give him a reason. Day 1 at 84; Day 2 at 145. She did say, however, that "it wasn't due to age discrimination," when he asked whether age was a reason for his termination. Day 1 at 85. Dr. Steele also approached Michael Cannon, the Chief of Staff at NDU, but Cannon did not give a reason. *Id.* Dr. Steele testified that he inquired about positions within NDU, but they all asked him for a reason for his termination, which he was unable to give. *Id.* at 83.

28.    Two months later, on July 20, 2011, Dr. Steele filed an informal EEO complaint alleging that he had been removed due to his age. Am. Compl. ¶ 10.

29.    On August 2, 2011, Colonel Bell placed Dr. Steele on administrative leave until his contract expired on August 19, 2011. Pl.'s Ex. 9.[5] Dr. Steele resigned from his position on August 17, 2019. Pl.'s Ex. 18.

30.    During the next semester, three faculty members—Dr. Sean McFate, who was 42, Dr. Jay Parker, who was 59, and Dr. Peter Thompson, who was 38—took over Dr. Steele's

---

[5] The reason for placing Dr. Steele on administrative leave was not explored at trial because the parties agreed that it was not relevant to the sole claim before the court. Nevertheless, the court notes that the D.C. Circuit affirmed the grant of summary judgment as to Dr. Steele's retaliation claim, which challenged the validity of his administrative leave. *See Steele v. Mattis*, No. 16-5236, 2017 WL 2332608, at *1 (D.C. Cir. Feb. 21, 2017). CISA took that action against Dr. Steele after receiving complaints from employees about Dr. Steele's erratic and aggressive behavior. *See Steele v. Carter*, 192 F. Supp. 3d 151, 161, 179 (D.D.C. 2016).

teaching duties. Def.'s Mot. to Dismiss and/or for Summ. J., ECF No. 25 [hereinafter Def.'s Mot.], Stmt. of Material Facts Not in Dispute, ECF No. 28-2, ¶ 28.

### D.    Comparators

31.    According to Dr. Steele, he was "replaced with younger people."  Day 1 at 85; *see also* Pl.'s Ex. 7 (asking Colonel Bell in an email, "Could it be that I'm being terminated due to the minor financial savings CISA might enjoy by replacing me with a slightly less expensive Assistant Professor who lacks experience?"); Pl.'s Ex. 28 (asking Colonel Bell in an email, "could I at least request an explanation why I'm effectively being replaced by inexperienced graduate students who lack PhD degrees").  Specifically, he identified three new hires, Geoffrey Gresh, Elena Pokalova, and Jeffrey Meiser, who were in their early 30s.  Day 1 at 85, 114; Pl.'s Ex. 15. Two of them—Dr. Gresh and Pokalova—would be joining the International Securities Studies department, and Meiser would be joining the Conflict and War department.  Day 1 at 114.

32.    Dr. Gresh was hired in August 2011 and started the following month.  Day 3 at 154. Dr. Gresh had his Ph.D at the time of his hiring and was the Director of the Armenian program at the Fletcher School of Law and Diplomacy at Tufts University.  *Id.* at 203.  He also had a Fulbright and experience in Iran, and he spoke Arabic.  *Id.*  During the 2011-2012 academic year, Dr. Gresh taught the Geostrategy and Cyber Revolutions classes.  Day 1 at 116; *see also* Pl.'s Ex. 33.

33.    Like Dr. Gresh, Meiser was hired in August 2011 and began in September 2011. Day 3 at 154.  Meiser was hired to strengthen CISA's courses on methods of argumentation and research.  *Id.* at 204.  He also had taught abroad, which was viewed as beneficial for teaching CISA's international students.  *Id.*

34.    Pokalova was a contractor who, prior to coming to CISA, worked for Booz Allen Hamilton.  Day 1 at 118–20; Day 3 at 164.  She was 31 years old and had done her dissertation on

Chechen terrorism. Day 1 at 137–38; Day 3 at 205. During the 2011-2012 academic year, Pokalova worked as a contractor teaching political ideology (Power, Ideology, and Legitimacy) and Cyber Revolutions. Day 1 at 118; Day 3 at 198; Pl.'s Ex. 33. Funding for Pokalova's position came from the AFPAK Hands program and, because she was a contractor, her position did not count against the full-time equivalent count. Day 3 at 198. The following year, Pokalova was hired as a faculty member. Day 1 at 120.

35.     Colonel Bell explained how CISA was able to hire Dr. Gresh, Meiser, and Pokalova, even though it let go of Dr. Steele. Colonel Bell had hoped to avoid having to make cuts, so in early 2011 he requested a waiver that would allow hiring nine faculty members, including for the new AFPAK Hands program. Day 3 at 161. In anticipation of the waiver's approval, CISA advertised to hire additional faculty for the fall semester. *Id.* at 161–62. Experience in terrorism studies in south and central Asia was desirable. *Id.* at 206.

a.     In May 2011, Colonel Bell learned that the waiver would be denied. *Id.* at 197. Consequently, Dr. Steele was notified in mid-May 2011 of the decision not to renew him beyond his probationary term. Notice was given to Dr. Steele at this time so that he would have sufficient time to look for other work. *Id.* at 80, 162.

b.     At the end of August 2011, slots for additional faculty at CISA opened up at the last minute because other components of NDU headquarters did not use up their full-time equivalent positions. *Id.* at 201. This enabled CISA to make the fall 2011 hires. By that time, however, CISA had effectively ended its relationship with Dr. Steele by placing him on administrative leave until his contract expired on August 19, 2011. Pl.'s Ex. 9; *see also supra* note 5. After August 2, 2011, the day he placed Dr. Steele on leave, Colonel Bell was not inclined to assist Dr. Steele in finding employment within CISA. Day 3 at 201–02.

36.     Dr. Steele identified another professor, Dr. David Ucko, as a comparator, who was retained through his probationary period over Dr. Steele despite being younger and, in Dr. Steele's view, less experienced. Day 4 at 122–23, 126–27. Dr. Ucko's focus was terrorism studies, and he published a book on the subject. *Id.* at 186. Based on his government experience, Dr. Steele believed he was as qualified to teach terrorism studies classes. *Id.* at 132–33.

37.     Dr. Paul Miller also was retained following his probationary period. As noted, Colonel Bell asked Dr. Miller to "stand up" the AFPAK Hands Fellowship Program. *Id.* at 127. Colonel Bell selected Dr. Miller (though he had not completed his Ph.D. at the time) because of his on-the-ground experience in Afghanistan, including in the military and the CIA, and at the National Security Council as the Director for Afghanistan. Day 3 at 207–08. In Dr. Steele's view, Dr. Miller exhibited surprising ignorance about South Asian history. Day 1 at 128–30. Dr. Steele believed he was qualified to teach in the AFPAK Hands Fellowship Program. *Id.* at 130–32, 179–80.

38.     Other than Colonel Bell, no other instructor as CISA had a Ph.D. in history, as did Dr. Steele. *Id.* at 179.

**E.     Administrative Proceedings**

39.     Two and a half months after his resignation, on or about November 2, 2011, Dr. Steele filed a formal complaint with the Department of Defense's EEO office. Am. Compl. ¶ 10. On May 10, 2013, the EEO office issued a Final Agency Decision, rejecting Dr. Steele's claims and giving Dr. Steele the right to file suit in federal court. *Id.* ¶ 11.

### III.    PROCEDURAL HISTORY

On August 9, 2013, Dr. Steele timely filed his Complaint in this action, alleging disparate treatment, retaliation, and hostile work environment under the ADEA, as well as constructive discharge and a claim for equitable relief.  *See generally id.*; *see also* Compl., ECF No. 1.

Following discovery, on May 4, 2015, Defendant filed a motion seeking dismissal or summary judgment.  *See* Def.'s Mot.  On June 29, 2016, the court granted Defendant's motion as to all counts.  *See Steele*, 192 F. Supp. 3d at 157.

Dr. Steele appealed this court's ruling.  The D.C. Circuit affirmed the grant of summary judgment with respect to the retaliation and hostile work environment claims.  *See Steele*, 2017 WL 2332608.  But it reversed the grant of summary judgment as to Dr. Steele's disparate treatment claim.  *See Steele v. Mattis*, 899 F.3d 943 (D.C. Cir. 2018).

On remand, starting on June 17, 2019, the court conducted a four-day bench trial on the remaining claim of disparate treatment under the ADEA.

### IV.    CONCLUSIONS OF LAW

#### A.    The ADEA

Dr. Steele claims he was a victim of age discrimination.  Under the ADEA, a federal government employer is prohibited from discriminating against an employee due to his age.  Specifically, section 633a(a) of the ADEA states that "[a]ll personnel actions affecting employees or applicants for employment [in the federal government] who are at least 40 years of age . . . shall be made free from any discrimination based on age."  29 U.S.C. § 633a(a).  "To prevail, '[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the "but-for" cause of the challenged employer decision.'"  *DeJesus v. WP Co. LLC*, 841 F.3d 527, 532 (D.C. Cir. 2016) (quoting *Gross v. FBL Fin. Servs.*, Inc., 557 U.S. 167, 177–78

(2009)).  The Act's protections extend to employees in "military departments."  29 U.S.C. § 633a(a).

To prove a claim of discrimination under the ADEA, a plaintiff may use either direct or circumstantial evidence.  *See Dunaway v. Int'l Bd. Of Teamsters*, 310 F.3d 758, 763 (D.C. Cir. 2002); *Holbrook v. Reno*, 196 F.3d 255, 260 (D.C. Cir. 1999); *Mianegaz v. Hyatt Corp.*, 319 F. Supp. 2d 13, 18 (D.D.C. 2014).  Where a plaintiff offers indirect evidence of discrimination, the court must follow the three-part, burden-shifting framework originally established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for use in Title VII cases.  *See DeJesus*, 841 F.3d at 532.  The plaintiff must first establish, by a preponderance of the evidence, a prima facie case of discrimination.  *See id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)).  This burden "is not onerous."  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  To establish a prima facie case under the ADEA, a plaintiff must show that he:  (1) is a member of the protected class (*i.e.*, is over 40 years old); (2) was qualified for the position; (3) suffered an adverse employment action; and (4) was disadvantaged in favor of a younger person.  *See Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1155 (D.C. Cir. 2004); *see also O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996) ("Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class.").  If the plaintiff establishes a prima facie case, the employer then must articulate a legitimate, non-discriminatory reason for its actions.  *See DeJesus*, 841 F.3d at 532 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981)).  "If the employer meets this burden, the framework falls away and the court must decide one ultimate question: 'Has the employee produced sufficient evidence for

a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee . . . ?'" *Id.* (quoting *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)).

Importantly, an academic institution, like CISA, is entitled to no more deference on this ultimate question than any other employer. *See Mawakana v. Bd. of Trustees of the Univ. of the District of Columbia*, 926 F.3d 859, 864 (D.C. Cir. 2019); *see also Steele*, 899 F.3d at 948 ("In the absence of a determination that the case involves a distinctly academic judgment of the type for which courts have found deference warranted, nothing in the ADEA supports the automatic imposition of a heightened pretext burden just because the defendant is an academic institution.").

### B.     Analysis

At trial, Dr. Steele advanced two related theories of age discrimination. The first was that age animus harbored by Dr. Bolanos and Dean Hanlon infected Colonel Bell's decision-making process about which probationary faculty member to release. The second was that CISA hired him to be a placeholder to meet its academic needs until the school could replace him with younger faculty. The evidence presented supported neither theory. In the end, Dr. Steele failed to carry his burden to prove by a preponderance of the evidence that his age was the "but for" cause of Defendant's decision to release him after his probationary year expired.

#### 1.     Cat's Paw Theory

Dr. Steele's primary theory of discrimination is what is known as a "cat's paw" theory of liability. Under that theory, "if a supervisor" acting within the scope of employment "performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011). Here, the evidence

clearly established that Colonel Bell, the Chancellor of CISA, made the key determination about which probationary faculty members would be released in response to the directive to reduce full-time equivalent employees. Dr. Steele posits, under a cat's paw theory, that the discriminatory animus of his immediate superiors—Dr. Bolanos and Dean Hanlon—infected Colonel Bell's decision-making. But the evidence showed otherwise.

To support his cat's paw theory, Dr. Steele relies heavily on the conversation that he had with Dr. Bolanos in the fall of 2010, soon after he started at CISA. But that evidence—whether treated as direct evidence or as support for his circumstantial case—does not help Dr. Steele for two reasons. First, for the reasons already discussed, *see supra* pp. 5–6, the court does not credit Dr. Steele's recitation of that conversation. His trial testimony was clearly embellished. In prior statements on the subject, both sworn and unsworn, Dr. Steele had not accused Dr. Bolanos of referring to older employees as "lazy" or saying that CISA was a better place now that it had "gotten rid of all these older faculty professors." *Compare, e.g.*, Day 1 at 49, to *Steele*, 899 F.3d at 946. Nor had he accused Dr. Bolanos of making racist remarks, as he did at trial. *See* Day 1 at 50. These clear embellishments cause the court to doubt the veracity of Dr. Steele's original allegations that Dr. Bolanos had said that younger employees were a "breath of fresh air" and older faculty were difficult to work with.

Dr. Steele's cat's paw theory as to Dr. Bolanos suffers from a second fatal flaw: she did not recommend to Colonel Bell or to Dean Hanlon that Dr. Steele should be removed. Dr. Bolanos credibly testified that she only made a recommendation about *when* to notify Dr. Steele about his termination, not *whether* he should have lost his job. Moreover, although she did have discussions with Colonel Bell and Dean Hanlon about Dr. Steele's performance, those conversations were sufficiently removed from the decision to terminate Dr. Steele's contract with CISA. Day 2 at

138–39, 144.  Dean Hanlon corroborated Dr. Bolanos's testimony, stating that Dr. Bolanos provided only general input about her department's teaching needs and agreed that her department could lose a faculty member without compromising the institution's mission.  Day 3 at 84–85.  Nor did Colonel Bell identify Dr. Bolanos as someone with whom he consulted about reducing staff.[6] At trial, Dr. Steele confronted Dr. Bolanos with prior statements made during the administrative proceedings about her role in his firing, Day 2 at 132–39, but the court did not find those earlier statements to undermine Dr. Bolanos's credibility or establish any greater participation by Dr. Bolanos in the decision-making process.

The evidence of Dean Hanlon's age animus is even less compelling.  Dr. Steele points to testimony from Dr. Blau that Dean Hanlon made comments about an older colleague, Dr. Marks, suggesting that the fact that he had to get up and go to the restroom during a meeting was "an old man thing."  Day 1 at 18.  Additionally, Dr. Blau testified that Dean Hanlon made other comments about Dr. Marks's hearing loss.  Although Dean Hanlon recommended to Colonel Bell not to extend Dr. Steele beyond his probationary term, the statements attributed to her by Dr. Blau are not, in the court's view, convincing evidence of age animus.  The court credits Dean Hanlon's testimony about her close relationship with Dr. Marks, which causes the court to question the statements attributed to her by Dr. Blau.  Furthermore, even if Dean Hanlon did make those statements, they are weak and attenuated evidence of age animus towards Dr. Steele.  Dean Hanlon testified extensively, without rebuttal, about the positive actions she had taken as Dean of CISA for older faculty and staff, including for Dr. Marks.  Day 2 at 90–94, 100–01.  The court gives

---

[6] At trial, Dr. Steele pointed to Plaintiff's Exhibit 8 as evidence that Colonel Bell relied on Dr. Bolanos's recommendation to remove Dr. Steele.  But that is not what the exhibit says.  Colonel Bell wrote: "Faced with these cuts, the academic leadership recommended to Colonel Bell that Dr. Steele, still in his probationary period, not be retained . . . ."  Pl.'s Ex. 8 at 2.  Colonel Bell did not specify in Plaintiff's Exhibit 8 who was included in "academic leadership."  At trial, however, he specifically identified Dean Hanlon as someone with whom he consulted but not Dr. Bolanos.

greater weight to Dean Hanlon's track record of positive treatment of older faculty than to the off-hand comments attributed to her by Dr. Blau. *See Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (observing that "a strong track record in equal opportunity employment" can rebut a claim of discrimination).

In sum, the court does not find that Dr. Steele carried his burden of showing that discriminatory animus on the part of Dr. Bolanos or Dean Hanlon infected Colonel Bell's decision-making process, such that the decision to terminate Dr. Steele's contract was due to his age.

2.     *Placeholder Theory*

Dr. Steele's placeholder theory is that CISA hired him to meet a pressing need for instructors in the fall of 2010, but it did so with the intent of replacing him immediately with younger faculty. To support this theory, and as evidence of pretext, Dr. Steele points to how heavily CISA recruited him but then quickly subjected him to criticism for his teaching methods. He also cites the hiring of younger professors in August 2011. And he notes some purported inconsistencies in Colonel Bell's explanation for his termination. Regrettably for Dr. Steele, the evidence does not support his claim of age discrimination.

The court found Colonel Bell's testimony credible as to how he came to recommend that Dr. Steele not continue past his probationary year. Colonel Bell said that he considered a host of factors in determining which positions to cut. Most significantly, Colonel Bell testified, he considered the availability of funding and academic needs. Day 4 at 41–42. Because two of the probationary positions—those occupied by Dr. Westneat and Malaguerra (a research associate)— were no longer being funded by the State Department, those positions were logical to cut. *Id.* at 42. Notably, Malaguerra was 30 years old at the time. *Id.* at 42–43. Next, Dr. Bell considered which faculty would best match CISA's priority programs. *Id.* at 43. He decided that Dr. Ucko,

because of his counterterrorism expertise, and Dr. Miller, because of his on-the-ground experience in Afghanistan and his time at the National Security Council, best fit the school's needs. *Id.* at 43–44. So, he kept them. That left Dr. Steele and Dr. Parker as probationary employees, and Colonel Bell selected Dr. Parker because he was a distinguished scholar and administrator from West Point, who was more experienced than Dr. Steele and a greater asset in terms of faculty recruitment and assisting with the accreditation process. *Id.* at 47. The court finds these reasons for selecting others over Dr. Steele to be convincing.

The evidence of pretext that Dr. Steele relies upon does not overcome Colonel Bell's non-discriminatory explanation. Dr. Steele points to how quickly he came under criticism for his teaching approach, after being so heavily recruited, as evidence that he was a mere placeholder. But the court takes that evidence at face value: the conflict with Dr. Steele arose from an academic debate over the most effective way to teach subject matter. It is not evidence of pretext.

Nor does the comparator evidence that Dr. Steele brought forward help him establish pretext. It is true that Colonel Bell retained probationary professors younger than Dr. Steele, namely, Dr. Ucko and Dr. Miller. But, as discussed, Colonel Bell articulated programmatic reasons tied to needs of the institution for selecting those professors over Dr. Steele. *Id.* at 43–45. Although Dr. Steele asserted that he was equally as capable as Dr. Ucko and Dr. Miller to teach the courses they taught, and although he questioned the depth of Dr. Miller's knowledge of South Asian history, Dr. Steele's self-assessment of his capabilities relative to those of his colleagues is not probative of the question of discriminatory intent. *See Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) (stating that "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff" (internal quotation marks and citation omitted)); *see also Walker v. Johnson*, 798 F.3d 1085, 1094 (D.C. Cir. 2015) (stating that the plaintiff's "own

personal opinion is inadequate by itself to create an issue for the jury" (citation omitted)). Additionally, one of the probationary employees that Colonel Bell retained, Dr. Parker, was 59 at the time. Pl.'s Ex. 14. Dr. Parker's age undermines the notion that Colonel Bell was using the mandated budget and positional reductions as a pretext to get rid of older faculty.

As for the new hires, that evidence also does not support pretext. As Colonel Bell testified, in late August 2011, new full-time equivalent positions came available as a result of underuse by other components of NDU. Day 3 at 201. That allowed Colonel Bell to proceed with hiring new faculty, particularly for the AFPAK Hands program, which was a top priority. Although the new hires were younger than Dr. Steele—Dr. Gresh was 33, Pokolova was 31, and Meiser was in his early thirties, *see* Pl.'s Ex. 15; Day 4 at 109–10—each brought capabilities to CISA that supported the institution's mission. The fact that Dr. Steele was not asked to remain after the full-time equivalents became available was a function of timing and Dr. Steele's later actions that caused him to be placed on administrative leave. *See supra* note 5. Colonel Bell placed Dr. Steele on administrative leave on August 2, 2011, *before* the new full-time equivalents came available. After placing him on leave, Colonel Bell was not inclined to retain Dr. Steele, even under the changed circumstances. The court credits Colonel Bell's testimony and explanation on this issue.

Dr. Steele also points to purportedly shifting explanations for his termination as evidence of pretext. But there are none. Dr. Steele's efforts to learn why he was let go were met with deafening silence. Dean Hanlon testified that she offered no explanation based on the advice of counsel. Day 3 at 39. The court finds the approach taken by CISA curious. After all, if the reason for terminating Dr. Steele was something as innocuous as budget and position cuts, why not tell him? Although the court deems CISA's silence odd, it is not sufficient, alone or with other evidence, to establish pretext.

Nor does claimed prior inconsistent testimony by Defendant establish pretext. In response to an interrogatory asking about the "funding issue," Defendant answered:

> There was not a funding issue directly related to the decision to terminate Dr. Steele's employment. The fiscal limitation concerned a decrease funding for Full Time Equivalent positions which resulted in a decrease in the positions that could be occupied. The fiscal limitation was not directed specifically at . . . Dr. Steele or the position filled by Dr. Steele.

Pl.'s Ex. 20. Although Colonel Bell did not sign the interrogatory response, he agreed with the second and third sentences of the response. Day 4 at 11–15. The court finds no inconsistency between the interrogatory response and Colonel Bell's testimony. Colonel Bell testified that the reduction in full-time equivalent positions is what drove the need to eliminate three faculty positions, not a reduction in funding *per se*. He also testified that the directive to reduce full-time equivalents was not directed to Dr. Steele or any particular position at CISA. Rather, CISA was required to reduce its faculty by three, without further direction as to programs or personnel. Defendant's prior statement about the "funding issue" therefore does not give rise to pretext.

Finally, weighing against a finding of discrimination is that Dr. Steele presented no direct evidence of any age-related animus by Colonel Bell. To the contrary, Colonel Bell testified at length to a record of positive actions he had taken for older employees, undercutting any notion that he was predisposed to getting rid of older faculty. To be sure, there was tension between Dr. Steele and Colonel Bell over Dr. Steele's teaching style, but that is not evidence of discriminatory intent.

In the end, the court finds that Dr. Steele did not carry his burden of establishing that he was hired merely as a placeholder to be replaced in the future with younger faculty.

## V.    CONCLUSION

For the foregoing reasons, the court finds in favor of Defendant on Dr. Steele's sole claim of age discrimination under the ADEA.  A separate final order accompanies these Findings of Fact and Conclusions of Law.

Dated:  November 15, 2019

_____
Amit P. Mehta
United States District Judge